**James S. STEPH, as Trustee in Bankruptcy of Chickasaw Lumber Company of Duncan, Oklahoma, Inc., bankrupt, Plaintiff,**

v.

**Hegel BRANCH, Defendant,**

**Ethel L. CHANDLER and Don Chandler, Third-Party Defendants.**

Civ. No. 5691.

United States District Court
E. D. Oklahoma.

June 22, 1966.

Norman E. Reynolds, Oklahoma City, Okl., for plaintiff.

G. M. Gardner, Duncan, Okl., for defendant, Hegel Branch.

James F. Bennett, Duncan, Okl., for third-party defendants.

DAUGHERTY, District Judge.

MEMORANDUM OPINION

This is a suit brought by the plaintiff as the duly qualified Trustee in Bankruptcy of the Chickasaw Lumber Company of Duncan, Oklahoma, an Oklahoma Corporation, a bankrupt, hereafter called

the Bankrupt or Chickasaw, against the defendant Hegel Branch, hereafter called Branch, to have declared null and void certain transfers of merchandise from the Bankrupt to Branch totaling $20,247.17, and recover the value thereof for the benefit of creditors. The defendant Branch denies that the said transfers are null and void and that the Trustee is entitled to recover anything from him and by a Third Party Complaint against Ethel Chandler and Don Chandler asks for judgment over against them for any amount which the Trustee may recover against him herein. The said Third Party defendants by way of answer to the Third Party Complaint deny that the Trustee is entitled to recover anything against Branch and that Branch is not entitled to recover anything against them in case the Trustee should recover against Branch herein on the basis that their note obligation to Branch has been fully satisfied. The case was tried to the Court.

The defendant Branch was the principal stockholder and controlled all other corporate stock of Chickasaw on February 13, 1963, when the company was sold to the Third Party defendants. The agreed purchase price of Chickasaw was in the sum of $28,000.00. Ethel Chandler paid to Branch by check the sum of $5,000.00, with the balance of the consideration being evidenced by a promissory note dated February 13, 1963, in the amount of $23,000.00, and signed by Ethel Chandler and Don Chandler individually and also signed by Chickasaw. A Contract of Sale for Chickasaw dated February 14, 1963, was entered into between Branch and Ethel L. Chandler. There was also a chattel mortgage and a security agreement both dated February 14, 1963, executed by Chickasaw to Branch covering certain buildings and equipment belonging to Chickasaw. These instruments did not cover the inventory. The Security Agreement was filed in the office of the County Clerk of Stephens County, Oklahoma, on February 19, 1963. It was not filed in Oklahoma County as provided by Title 12A, Oklahoma Statutes, Section 9–401, and thus the defendant

Branch was not a secured creditor of the Bankrupt. These instruments were given as security for the said $23,000.00 note.

Said note provided for monthly payments of $100.00, beginning March 15, 1963, and contained the further provision in addition to the said monthly payments that Chickasaw and Donald R. Chandler and Ethel Chandler as signatories thereof agreed to furnish such construction materials to the holder of the note as the holder thereof may from time to time purchase from Chickasaw at cost plus 20% and said sums to be deducted from the balance of the note.

During the period from April 9, 1963 to August 9, 1963, Branch received merchandise on open account from the Bankrupt totaling $942.27. During the period of August 10, 1963 to March 20, 1964, Branch received merchandise under said provision of the note in the amount of $18,652.67, for a total of merchandise received from the Bankrupt by Branch, including the 20% charge, of the value of $19,594.94. Only two of the $100.00 payments were made, both being made in April, 1963. During the period April 9, 1963, to August 9, 1963, Branch obtained merchandise which was carried as an account receivable owed by Branch. On August 12, 1963, this account receivable was cancelled and applied as a credit on said note. Thereafter, as shown by the sales tickets, when Branch received merchandise from Chickasaw a sales ticket was made out by Chickasaw on its regular form showing the sale to have been charged to or made to Branch. On several occasions when Branch needed materials not present in the yard of Chickasaw Don Chandler would order and deliver the same to Branch.

At the time of the sale of Chickasaw Branch retained all cash and accounts receivable belonging to Chickasaw and agreed to and did pay all obligations but one then owed by Chickasaw.

The Court finds from the circumstances of the sale and the evidence herein that the fair and reasonable value of Chickasaw as sold to Don and Ethel

Chandler on February 13, 1963, was in the agreed sale price of $28,000.00.

Don Chandler who was the son of Ethel Chandler was to run Chickasaw and he took possession on February 15, 1963. Ethel Chandler lent Chickasaw $1600.00, with which to start business and thereafter she made or endorsed further loans to Chickasaw which were obtained from a local bank and for all of such monies she was treated on the books as a creditor of Chickasaw. Some of this money was repaid to Ethel Chandler.

Prior to the sale of Chickasaw by Branch to the Chandlers the company was managed by Casey Jones, father-in-law of Branch. Jones continued to operate the company for the Chandlers. Shortly after taking over, Don Chandler became ill, underwent surgery and did considerable drinking. During Chandler's absence Casey Jones was in charge of the business. The business under the management of Don Chandler started incurring losses immediately which losses continued at an approximately steady rate during the entire operation. Beginning in the fall of 1963, Don Chandler started making bulk sales of merchandise at bargain prices to others in the lumber business.

A Public Accountant made an analysis of the books, records and operations of the Bankrupt from February, 1963, to the time of bankruptcy and testified in the case. From his testimony and charts put in evidence the Court finds that the general picture revealed some purchases of new inventory but progressively increasing accounts payable with the inventory showing depletion to practically nothing. Monthly expenses, not including inventory purchases, averaged between $1500.00 to $2000.00. The bank balance never contained more than $2500.00, as a month end balance. At the end of June, 1963, the balance was $6.00 and at the end of July, 1963, the balance was $98.00. In all, to the time of bankruptcy, Chickasaw had purchased and paid for about $15,000.00 worth of new inventory, its accounts payable which started with only the $1600.00 in cash advanced by Ethel Chandler rose to approximately $47,000.00. Inventory started out at approximately $17,000.00, never exceeded that amount and dwindled down to very little at the time of bankruptcy. It was also clearly established by this witness, through testimony and charts, that the Bankrupt became insolvent as defined by Section 67d(1) (d), of the Bankruptcy Act[1] on May 1, 1963, at which time its debts, including its note to Branch signed by the Bankrupt, totaled $31,090.00, and its assets had a fair value of but $30,974.00. The Court, therefore, finds that the Bankrupt was insolvent on May 1, 1963, and at all times thereafter.

The effect of the arrangement created and entered into regarding the sale of the corporate stock of Bankrupt between Branch and the Chandlers, to which they made the Bankrupt a party, as to any merchandise or construction materials received by Branch from the assets of the Bankrupt in payment of the note held by Branch, was for the Bankrupt to pay for most of the purchase price of the corporate stock purchased from Branch by the Chandlers. In other words, the Chandlers bought all the corporate stock of the Bankrupt from Branch but the Chandlers did not pay the entire purchase price thereof, the same being paid in large part out of the assets of the Bankrupt to the extent of $19,594.94.

This effect, of course, was known to Branch from the first since it was provided for in the note itself which he prepared and he then knew by actual knowledge that each item of the $19,594.-94 in merchandise came to him directly from the assets of the Bankrupt and that the Chandlers got credit therefor on their note given to Branch in part payment of said corporate stock.

1. Section 67d(1) (d) of the Bankruptcy Act reads as follows:
 "d.(1) (d) a person is "insolvent" when the present fair salable value of his property is less than the amount required to pay his debts: * * *"

These assets of the Bankrupt received by Branch did not go through the Chandlers as they were first directly charged to the account of Branch with Chickasaw which account was later cancelled and applied as a credit on the note and thereafter such assets were received directly by Branch from the Bankrupt on sales tickets made out to Branch as the purchaser.

■■ By this arrangement, as executed in the amount of $19,594.94, the Bankrupt was discharging the personal debt and obligation of the Chandlers to Branch under their note. There is no evidence that the Bankrupt was purchasing its own corporate stock and, moreover, the evidence shows that the Bankrupt had no surplus from which to make such purchase and was insolvent when all transfers of assets were made to Branch. A corporation can only purchase its own corporate stock from surplus and then only while solvent. 18 Oklahoma Statutes, 1.136 and 1.137. In addition the said mortgage and security agreement given by the Bankrupt to Branch to secure part of the purchase price by the Chandlers of the corporate stock of the Bankrupt were invalid as against the Trustee. In the Matter of Atlas Foundry Company (D.C.D.N.J.1957), 155 F.Supp. 615.

In Pemberton v. Longmire (1944), 194 Okl. 311, 151 P.2d 410, it was held that a bankruptcy Trustee may maintain an action for the benefit of creditors of a bankrupt corporation to recover money collected by a stockholder from the corporation on the sale of his corporate stock to another. This case also held the seller of such corporate stock to be liable to the extent of the value of assets received from the bankrupt corporation. In quoting from opinions from other similar cases this case provided as follows:

" 'Where the check of a corporation, signed by one of its officers, is used to pay his personal debt, the proceeds may be recovered by the corporation's trustee in bankruptcy from the party receiving the check unless he shows that the officer had authority to issue it.' * * *

'Where one stockholder sells his share of stock to another stockholder under an agreement by which the stock is to be paid for out of the assets of the corporation, the seller is liable in an action for the benefit of the creditors of the corporation to the extent of the value of the assets which he has received.' * * *

'The officers or directors of a corporation have no power to pledge its notes to secure the payment of a personal debt of its president.' * * *

'Corporation officer or stockholder has no ostensible authority to divert corporation's assets in payment of his debts, nor may one dealing with him assume that he has such authority.' * * *

'An officer of a corporation having general authority to execute promissory notes for it in the course of its business has no authority to execute the note of the corporation, without consideration or benefit moving to it, for the payment of his personal debt, or that of another. If the payee in such a note has notice of the purpose for which it was executed, he cannot maintain an action thereon against the corporation. The fact that the officer executed the note of the corporation in payment of his own debt, or that of another officer of the corporation to the payee, is sufficient to charge him with notice.' * * *

'One who receives from an officer of a corporation the securities of such corporation as security for a personal debt of such officer does so at his peril.' * * *

'An officer of a corporation has no general authority to transfer property of a corporation in satisfaction of the officer's individual obligation, and any person entering into a contract with an officer of a corporation under such circumstances does so at his peril and must ascertain that special authority has been conferred.' * * *

'Both reason and authority support the proposition that where one stockholder sells his shares of stock to another stockholder under an agreement by which the stock is to be paid for out of the assets of the corporation, the seller is liable in an action brought for the benefit of the creditors of the corporation to the extent of the value of the assets which he has received.' "

The evidence revealed the last minutes of a stockholders' meeting and directors' meeting of Chickasaw before the sale to the Chandlers were for meetings held on February 2, 1962, over a year prior to the sale, and the next such meetings were held on March 1, 1963, after the sale was consummated and the note was signed by Chickasaw. No authority or ratification was shown to the Court either for Chickasaw to purchase its own corporate stock or to obligate itself to pay the debt of others or to sign the note in question or to mortgage its buildings and equipment.

In view of the foregoing findings of fact and under the authority of the case of Pemberton v. Longmire, supra, the Trustee is entitled to recover from Branch the sum of $19,594.94, representing assets of the Bankrupt wrongfully received by Branch in payment of the personal obligation of the Chandlers to Branch for their purchase from Branch of all the corporate stock of the Bankrupt.

Moreover, the Trustee herein is also entitled to recover the said amount of $19,594.94, from Branch under the provisions of Section 67d(2) (a) of the Bankruptcy Act.[2] This section provides that every transfer made within one year prior to the filing of a petition in bankruptcy is fraudulent as to creditors existing at the time of such transfer, if the same was made without fair consideration by a debtor who is or will be thereby rendered insolvent without regard to his actual intent.

The Petition in Bankruptcy was filed herein on May 22, 1964. The account receivable of Branch with the Bankrupt was cancelled on August 12, 1963, and the balance thereof in the amount of $942.27 was applied on said date as a credit to reduce the balance of the promissory note. This transfer took place within the one year period. Then beginning on August 10, 1963, and continuing to March 20, 1964, Branch received direct from the Bankrupt from its assets merchandise or construction materials, all delivered directly to Branch on sales tickets made out to Branch which sales tickets during the aforementioned period totaled the sum of $18,652.67. All of these transfers of the assets of the Bankrupt to Branch which were applied in payment of the Chandler note and obligation for their purchase of the Bankrupt corporate stock took place within the period of one year before bankruptcy on May 22, 1964.

All of these transfers, totaling $19,594.94, were without fair consideration to the Bankrupt and the Court so finds inasmuch as the Bankrupt received absolutely no consideration from these transfers. 30 A.L.R.2d 1212. The only persons receiving any consideration from these transfers were the Chandlers who obtained a personal consideration in the form of their purchase price note to Branch for the corporate stock of Chickasaw being accordingly reduced. But this consideration to the Chandlers for their personal obligation cannot be said to be a consideration to the Bankrupt whose inventory was being depleted without any consideration to it which activity eventually led to its bankruptcy.

2. Section 67d(2) (a) of the Bankruptcy Act reads as follows:

"(2) Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this Act by or against him is fraudulent (a) as to creditors existing at the time of such transfer or obligation, if made or incurred without fair consideration by a debtor who is or will be thereby rendered insolvent, without regard to his actual intent;"

As stated above by the testimony and charts submitted by the Public Accountant as an expert witness it is clearly shown that by May 1, 1963, the liabilities of the Bankrupt exceeded its assets and from then on its liabilities continued to exceed its assets until there were no assets and large liabilities. Thus, all of the transfers of the assets of the Bankrupt to Branch beginning with the August 12, 1963, cancellation of the account receivable of Branch and the sales ticket transfers to Branch commencing August 10, 1963, were made at a time when the Bankrupt was insolvent and each of such transfers served to render the Bankrupt more insolvent. As shown by this provision of the Bankruptcy Act itself and the findings of fact made herein by the Court, it is apparent that the Trustee is entitled to recover the said sum of $19,594.94, from the defendant Branch herein under Section 67d(2) (a) and is entitled to recover this amount without regard to any actual intent on the part of anyone.

 Furthermore, the Trustee would also be entitled to recover the said amount of $19,594.94, from Branch under the provisions of Section 67d(2) (b) of the Bankruptcy Act.[3] This section makes transfers made within one year prior to the filing of a petition in bankruptcy fraudulent as to creditors if made without fair consideration by a debtor in business when the property then remaining on hand constitutes an unreasonably small capital and again without regard to actual intent. There was no fair consideration to the Bankrupt in the transfer of its merchandise to Branch as discussed and held above. The testimony as to what a reasonable capital would be for the business involved herein ranged from a low of $10,000.00,

to a high of $50,000.00. Including the note to Branch as a liability, the Bankrupt never had over $5,000.00, in capital according to the testimony and charts of the Public Accountant. Excluding the note to Branch as a liability (which exclusion is not believed proper under the authority of Pemberton v. Longmire, supra, and In re College Chemists, Inc., (2d Cir. 1933), 62 F.2d 1058 and based on the testimony and charts of the Public Accountant the business of the Bankrupt deteriorated in such speed and fashion that by August 10, 1963, its capital, which would have started at $28,000.00, was reduced to approximately $10,000.00. The Court finds from the evidence that a reasonable capital for the business involved herein would be $20,000.00, and anything thereunder would be an unreasonably small capital. Thus, the Court finds in all events that by August 10, 1963, all transfers to Branch of the merchandise of the Bankrupt must be considered as being fraudulent and recoverable herein by the Trustee by reason of the transfers and each of them being without fair consideration to the Bankrupt and leaving an unreasonably small capital in the hands of the Bankrupt.

Thus, for all three reasons, namely, the wrongful arrangement whereby the Bankrupt paid the personal obligation of the Chandlers and the transfers of assets from the Bankrupt to Branch being fraudulent under two different sections of the Bankruptcy Act, the plaintiff is entitled to recover judgment against the defendant Branch for the sum of $19,594.94, with interest.

 The defendant Branch is then entitled to judgment over against the Third Party defendants, Ethel Chandler and Don Chandler, on his Third Party Complaint for the amount of the recovery allowed against him herein in favor of

---

3. Section 67d(2) (b) of the Bankruptcy Act reads as follows:
"(2) Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this Act by or against him is fraudulent (b) as to then existing creditors and as to other persons who become creditors during the continuance of a business or transaction, if made or incurred without fair consideration by a debtor who is engaged or is about to engage in such business or transaction, for which the property remaining in his hands is an unreasonably small capital, without regard to his actual intent."

the plaintiff. This is because the defendant Branch sold and delivered to the Third Party defendants, Ethel Chandler and Don Chandler, all of the corporate stock of a going business which was substantially free of debts at the time, which business between them had an agreed value of $28,000.00. Branch is entitled to receive this agreed sale price. He originally received the sum of $5,000.00, by check from Ethel Chandler and has retained the same. In due course the $23,000.00 note, representing the rest of the purchase price, was paid and the note was surrendered by Branch. However, by this litigation Branch is required to pay to the Trustee of the Bankrupt, for the reasons above set forth, the sum of $19,594.94, which he had received from the assets of the Bankrupt and applied as credit toward the retirement and payment of said note. The mismanagement of the Chandler operation and their losses and resulting bankruptcy regarding Chickasaw are all the responsibility of the Chandlers and they are responsible for Branch not receiving the agreed purchase price for the corporate stock of Chickasaw from the Chandlers. It is not shown by the evidence that the attorney-client relationship existed between Branch and the Chandlers at any time involved herein. The Third Party defendants are, therefore, responsible and liable to the defendant Branch in said amount of $19,594.94, and the defendant Branch is entitled to judgment over against them for such amount as requested in his Third Party Complaint.

Therefore, the plaintiff should have judgment against the defendant Branch in the sum of $19,594.94, with interest as provided by law and the defendant Branch should have judgment over in the same amount against the defendants, Ethel Chandler and Don Chandler, with interest as provided by law.

Counsel for the plaintiff and defendant Branch will collaborate in the preparation of a judgment to the above effect and present the same to the Court for execution and filing.