123 N.J. Super. 400 (1973)
303 A.2d 340
ROXBURY STATE BANK, A BANKING CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
THE CLARENDON, ROBERT S. DOUGLAS, LEONARD A. CODELLA, EVELYN PUTZ, WILLIAM PUTZ, LOTTIE PUTZ AND ERNEST PUTZ, AND THE TOWN OF HACKETTSTOWN, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided April 5, 1973.
*402 Mr. Steven S. Radin for plaintiff Roxbury State Bank, (Messrs. Sills, Beck, Cummis, Radin & Tischman, attorneys).
Mr. Richard B. Thomas, Jr. for defendants Putz (Messrs. Schenck, Price, Smith & King, attorneys).
Mr. Abraham Natovitz, attorney for Receiver of defendant The Clarendon.
*403 STAMLER, J.S.C.
A foreclosure complaint was brought by plaintiff Roxbury State Bank against The Clarendon, a New Jersey corporation. Named as defendants, among others, were Evelyn, William, Lottie and Ernest Putz, holders of a mortgage subordinated to that of plaintiff. The complaint was filed on August 16, 1971.
A related case is Putz v. Hook Mountain Industries, Inc. and The Clarendon (C-1660-70). The complaint in that case was filed on August 2, 1971, alleging insolvency of both corporations and demanding appointment of a statutory receiver. The insolvency of both corporations was clear and on September 13, 1971 a statutory receiver for The Clarendon was appointed. Thereafter a statutory receiver was appointed for Hook Mountain.
The Putz family counterclaimed in the foreclosure suit, asserting that the bank's mortgage was invalid in toto because it was the product of a fraud, and that their second mortgage should therefore be the first valid mortgage transaction to be recognized by the receiver and the court.
The receiver does not question the validity of the bank mortgage per se but questions the amount claimed to be legally due thereon as a secured claim. The receiver takes the position that the Putz mortgage is invalid and unenforceable for lack of consideration.
The property in question is the land and building which comprise The Clarendon Hotel located in Hackettstown, New Jersey. There, for many years prior to 1963, Ernest and Wiliam Putz operated a hotel and restaurant business.
Historically, the facts prior to the execution of the bank mortgage sought to be foreclosed reveal that Ernest Putz, his brother William and their respective wives were the owners of all the outstanding shares of capital stock of defendant Clarendon. Ernest and William operated the hotel and restaurant business prior to 1967, when Ernest retired and William continued. William's wife had died at an earlier date. At the time of Ernest's retirement the hotel and restaurant business was placed with a real estate broker *404 at an asking price of $500,000. No purchasers were found at this price. In the spring of 1970 William was advised by his physician to retire from the business for reasons of health, and in April of that same year listed the business with another broker, Francis Tierella, at the price of $300,000.
In the summer of 1970 Tierella introduced prospective purchasers, Robert S. Douglas and Leonard Codella, to the Putz Brothers. Codella and Douglas, in anticipation of completing the transaction, approached the bank concerning the possibility of obtaining a mortgage loan. The purpose of the loan is best described by the bank in its trial brief: "They [Douglas and Codella] had apparently engaged in discussions with the Putz's or their agents relative to the purchase of all the stock in The Clarendon. It was for this potential purchase that they needed the loan." The Putzes in the interim had referred the proposals of Douglas and Codella to their attorney, Robert L. Schuman.
On September 28, 1970 the bank approved a mortgage loan to The Clarendon and issued a 30-day commitment letter for that loan. The commitment provided that the loan was to be in the amount of $160,000, with a 10% annual rate of interest plus "a mortgage origination fee of five percent (5 points)." Repayment was to be made on the basis of a 20-year amortization with a 10-year maturity which produced monthly installment repayments of $1,545 plus tax payments. There was to be a mortgage note executed by The Clarendon running to the bank which would be secured by the first mortgage. It would cover the real property and improvements that make up The Clarendon Hotel. This note was to be individually guaranteed by Douglas and Codella.
At the time of the application to the bank by Douglas and Codella there was outstanding an unsecured note of Rainbow Hills in the amount of $25,702.48 with interest from October 8, 1970 at the rate of $5.90 a day, and an installment loan of Global Fabricators in the amount of $8,092.58. Both loans were in a very precarious position. It was acknowledged *405 by the bank that both of these companies were solely owned by Douglas, the principal officer and stockholder of each. The bank was concerned at the time of the consideration of the application for the new loan that if the Rainbow Hills and Global Fabricators loans remained outstanding, the bank might be violating existing banking laws in exceeding the statutory limitations on loans as they related to the financial position of the lending institution.
The president of the bank forthrightly stated that both the Rainbow Hills loan and the Global Fabricators loan, although in corporate name, were in reality loans to Robert Douglas, and if the loan to The Clarendon was considered a loan to Robert Douglas as a principal and there were no provisions for repayment of the old outstanding loans, the bank would have exceeded its legal limit for it was not permitted to loan to any one borrower more than 10% of its capital surplus. Therefore the bank conditioned its loan of $160,000 to The Clarendon upon agreement by Douglas and Codella that from the proceeds of the loan the two outstanding and overdue debts, that of Rainbow Hills and that of Global Fabricators, would be fully repaid. This commitment letter with the conditions so attached was sent to Robert Douglas and to his then attorney. There is no question but that the bank was concerned about the collectibility of both Rainbow Hills and Global Fabricators loans.
Having received the commitment the negotiations between Douglas and Codella on the one hand and the Putzs continued. A contract of sale was entered into which was a contract for the purchase by Douglas and Codella in the name of Hook Mountain Industries, a New Jersey corporation controlled by Douglas and Codella, of all of the outstanding capital stock in The Clarendon for a base purchase price of $300,000. The Putzs, knowing the requirements of the continuation of the business and knowing that they would not receive all cash for their stock asked their attorney, Schuman, to communicate with the bank and ascertain whether the *406 mortgage commitment required by the contract of sale had been secured. President O'Neil of the bank, by letter dated October 9, 1970, responded as follows:
In accordance with our telephone conversation, please be advised that the Executive Committee of the Roxbury State Bank has approved a Mortgage Loan to The Clarendon (a New Jersey Corporation) in the amount of $160,000.00. The note to bear interest at the rate of 10% per annum plus five points, to be personally endorsed by Robert Douglas and Leonard Codella, and to be secured by property and improvements located at Route 46, Hackettstown, New Jersey, and known as the "Hotel Clarendon". The note is to be amortized monthly over a period of twenty years; however, the entire balance shall be due and payable in ten years from date. Prepayment is subject to a penalty of 3% of the outstanding balance during the first three years, 2% during the fourth year, 1% during the fifth year, and nothing after the fifth year.
From the foregoing it is clear that the "five points" referred to would require a deduction from the proceeds of the $160,000 by $8,000, leaving (at least insofar as Schuman was aware) a payment out from the bank of The Clarendon of $152,000. O'Neil in his letter to Schuman omitted what he had stated in a prior letter to the attorneys for Codella and Douglas:
The borrowers have agreed to repay certain obligations from the proceeds of this loan. An unsecured loan of Rainbow Hills in the amount of $25,702.48 with interest from October 5, 1970 at the rate of $5.90 per day and an installment loan of Global Fabricators in the amount of $8,092.58. This balance is good until October 31, 1970. Both companies are owned by Mr. Douglas, the principal.
The commitment letter containing the foregoing language, though directed to the attorney for Douglas, was sent to Douglas and not to The Clarendon, as might be inferred from the notation on the letter. William and Ernest denied seeing this letter until after the litigation had commenced.
On or about October 15, 1970 an agreement of sale was entered into between the Putzs and Hook Mountain Industries, pursuant to which the Putzs transferred to Hook Mountain all of the capital stock in The Clarendon. The *407 agreement set forth a projected pay-off schedule. The Putzs were to be paid on closing for their stock $50,000 in cash  $32,500 to Ernest and $17,500 to William. There were also to be promissory notes from Hook Mountain of $107,500 to William and $92,500 to Ernest. These notes were to be secured by the escrow of the stock of The Clarendon, and in the event of default in any of the terms of the promissory notes by Hook Mountain the Putzs would be entitled to sell all the stock, the proceeds to be applied to the balance due on the notes. As additional security for the repayment of the notes Hook Mountain, as owner of the stock, agreed to have The Clarendon execute a second mortgage upon its real property in favor of the Putzs. This mortgage was to be second to "any first mortgage which may be placed upon The Clarendon real property in the principal amount not exceeding $160,000."
O'Neil, whose recollection was hazy as to when he saw the sales agreement (either prior to making the loan, or at the closing), was well aware that a large portion of the proceeds of the bank loan would immediately go to the Putzs. He must have known this, for the sales price was $300,000 and the second mortgage from Clarendon to the Putzs was to be only for $196,000. Additionally, Roxbury was the escrow holder of all of The Clarendon stock in the name of Hook Mountain, to be held for the benefit of Putz.
On November 13, 1970 closings were held, first at the office of Schuman on the sale, note and second mortgage, and later that day at the office of attorneys for the bank the first mortgage.
At the closing Douglas, as president, and Codella, as secretary signed and delivered Clarendon checks drawn on the newly opened Roxbury Bank account as follows:

 Ernest Putz and Lottie Putz $ 32,500
 (check designated "purchase of stock")
 William Putz and Evelyn Putz 17,500
 (no designation on check)
 William Putz 26,500

*408
 (check designated "repayment of loan")

According to the bank mortgage closing statement on November 13, 1970 the following appears:

 Proceeds of loan: $160,000
 Deduct "Credit The Clarendon Account": 34,645.48
 Deduct "Mortgage origination fee" 8,000.00
 ___________
 Balance Mortgage Proceeds to Borrower $117,354.52

On the same day Douglas, signing as president of The Clarendon, drew two checks:

 To payee Rainbow Hills, Inc. $ 26,505.31
 To payee Global Fabricators, Inc. 8,140.17
 ___________
 $ 34,645.48

The Rainbow Hills check carried the endorsement, "Payoff Unsec. Loan." The Global Fabricators check carried the endorsement, "Payoff Truck Loan."
The bank mortgage required consecutive monthly installments of $1,545. On the day the foreclosure complaint was filed (August 16, 1971) this mortgage was five payments in arrears. This meant that the note fell into default on or about April 1, 1971, less than five months after origination.
To recapitulate, on November 13, 1970 The Clarendon only received for its renovation and operation $40,854.52 while encumbering all of its assets for a total sum of $356,000, grossly in excess of the value of the property, with an overwhelming debt service on the respective mortgages which the corporation could not meet.
Hook Mountain was merely a shell and its only source of income was to be in the form of "rent" from its wholly owned subsidiary, The Clarendon.
During the few months after the sale and mortgages Codella and Douglas syphoned off into Hook Mountain substantial sums, including monies to pay for automobiles for their private use. (After being appointed the receiver operated The Clarendon. However, prior to trial he determined that the business was operating at a loss and that the property *409 was disintegrating rapidly. The receiver upon appropriate application and notice to all parties, was directed to sell the property pendente lite, legitimate liens to attach to the proceeds. The sale produced $198,000.) In reality, both corporations were insolvent in a statutory and in an equitable sense, on the day of the closing or shortly thereafter.
In first attending to the Putz second mortgage it is seen that this mortgage in the sum of $196,000 was security for the sale of all of the stock by the Putzs to Hook Mountain. It has been held that a mortgage by a corporation to secure the purchase price of stock sold by stockholders in a corporation is invalid as against a trustee in bankruptcy. It is fraudulent. In re Atlas Foundry, 155 F. Supp. 615 (D.N.J. 1957); see also, Steph v. Branch, 255 F. Supp. 526, 530 (E.D. Okl. 1966), aff'd 389 F.2d 233 (10 Cir.1968); Martin v. General Finance Co., 239 Cal. App.2d 438, 48 Cal. Rptr. 773, 776 (D. Ct. App. 1966). The same rule should apply to statutory receivers.
Hook Mountain, the purchaser, was a sham corporate vehicle for Douglas and Codella. The second mortgage was simply a fraudulent method to secure the useless Hook Mountain note, carrying the personal guarantees of Douglas and Codella, who were at the time of closing president and secretary of The Clarendon. A mortgage by a corporation to secure a personal debt of an officer is invalid. Catabene v. Wallner, 16 N.J. Super. 597 (1951).
Although a solvent corporation with power to purchase its own stock may mortgage property in order to raise funds to purchase stock of a dissident, disruptive shareholder, the burden is on the corporation to show the stock so purchased became treasury stock and that there has been no injury to creditors. Hook Mountain, The Clarendon, Douglas and Codella could not establish this fact. The imposition of the debt upon Hook Mountain which had no ability to pay, and the mortgage of $196,000 upon The Clarendon for the sole use and benefit of Codella and Douglas, was an unwarranted use of corporate credit. This mortgage *410 was totally without consideration running to The Clarendon. Backus v. Finkelstein, 23 F.2d 357, 362 (D. Minn. 1927). The second mortgage must be held to be invalid because of the manner in which the property and the rights of the corporation were made the convenient personal assets of Douglas and Codella, of which the second mortgagees were fully aware.
Attending to the first mortgage of the bank it is concluded that it is invalid in part. The bank president was fully aware that a substantial part of the loan was to be used to purchase all the stock of The Clarendon. It dealt with Douglas and Codella as principals, and the use of the corporate vehicle of a loan to The Clarendon, rather than a loan to Douglas and Codella directly, was to enable the bank to charge "points" and a higher rate of interest.
The general rule is that one who loans money to a corporation is required only to pay it to the proper officers of the corporation, and the lender is not called upon to follow the loan and see that it is properly used or applied. This rule cannot be applied in the case at bar.
In Gross Iron Ore Co. v. Paulle, 132 Minn. 160, 156 N.W. 268, 270 (Minn. Sup. Ct. 1916), it was held:
However, if it appears that money is borrowed, not for a corporate purpose, but for the private use of the officer of the corporation to whom it is paid and with intent on his part to divert it to such private use, and that the lender knows or is chargeable with knowledge of that fact, then the transaction, so far as the corporation is concerned, is a nullity.
See also Backus, supra, 23 F.2d at 363.
Our Court of Errors and Appeals commented in Heidler v. Werner & Co., 97 N.J. Eq. 505 (E. & A. 1925), that although the question had not been raised below, a corporation may not lawfully execute a bond secured by a mortgage on corporate property, to the detriment of its creditors, as a pure accommodation to one or more of its stockholders.
*411 Vice-Chancellor Van Fleet in Holt v. Creamer, 34 N.J. Eq. 181 (Ch. 1881), expressed his view of a not dissimilar transaction:
The legal rules to be applied in settling the rights of the parties to this controversy are firmly established. There can be no doubt that to the extent that the real debt, which this mortgage purported to secure, was false, the mortgage was without consideration, and consequently fraudulent as to creditors. Nor can it be doubted that if a mortgage be given with the fraudulent intent to cover and conceal from the mortgagor's creditors a part of his property, although, as to another part of his property, it is meant to be an actual security for an honest debt, that, as to creditors, it will be declared altogether void. Russell v. Winne, 37 N.Y. [591] 596. A deed which is fraudulent in part, as to creditors, will be declared void in toto. Mead v. Coombs, 4 C.E. Gr. 112. In such transactions, fraud vitiates absolutely whatever it infects. All the partialities of the law expire under its antipathy to fraud. [at 187]
A portion of the funds advanced by the bank went to pay off the personal past due indebtedness of Douglas' solely held corporations. A portion was used to pay off part of the purchase price to the sellers. "Points" were charged on the total amount of the loan, including the Rainbow Hills and Global Fabricators loan. However, part of the proceeds were used to clear a legitimate earlier first mortgage of $18,925 and a note payable to William Putz in the sum of $26,500.
In Reed v. Helois Carbide Specialty Co., 64 N.J. Eq. 231 (Ch. 1902), it was held that a mortgage may be good for some component parts of the mortgage-money and bad as to the residue. Equitably, the bank should not be deprived of its prior secured position in toto. If the consideration of a mortgage is made up of several distinct transactions, some of which are illegal, and that part of the consideration which is legitimate can be separated with ease from that which was illegal, the mortgage may be held valid for that part of the consideration free from illegality. Feldman v. Gamble, 26 N.J. Eq. 494 (Ch. 1875).
Although "points" charged to a corporation may by inference be a legitimate charge, and "points" are only prohibited *412 in mortgages covering dwellings (see N.J.S.A. 46:10B-1 et seq.), the five points referred to in the bank commitment can only be charged on the legitimate consideration advanced. Therefore that amount must be recalculated.
The bank purportedly advanced $160,000 for legitimate purposes and charged $8,000, or "five points.' However, I conclude that the consideration to The Clarendon was an advance of only $75,354.52. This figure is arrived at by deducting the Rainbow Hills indebtedness of $26,505.31, the Global Fabricators indebtedness of $8,140.17 and the payment to Ernest and William of $50,000 (downpayment on stock) from the $160,000. Of each of these, the bank knew or should have known of the invalidity. To this may be reluctantly added the "five points," or $3,767.72.
It is concluded that the first mortgage of the bank represents a prior secured lien in the sum of $79,122.24 with interest thereon at 10% from November 13, 1970. As set forth above, the Putz mortgage is totally unenforceable as against The Clarendon or Hook Mountain. This determination does not prevent the bank or the Putz family from proceeding against Douglas and Codella individually. However, it does preclude both the bank and the Putz family from asserting the validity of a claim as general creditors of The Clarendon. It does not decide the claim of Putz against Hook Mountain on the stock escrow agreement.
The receiver is to submit an order in conformity with this opinion, consented to as to form or pursuant to the five-day rule.