129 N.J. Super. 358 (1974)
324 A.2d 24
ROXBURY STATE BANK, A BANKING CORPORATION OF NEW JERSEY, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT,
v.
THE CLARENDON, ROBERT S. DOUGLAS, LEONARD A. CODELLA, THE TOWN OF HACKETTSTOWN, AND O. DAVID FISCHER, AS RECEIVER OF THE CLARENDON, DEFENDANTS-RESPONDENTS, AND WILLIAM PUTZ, EVELYN PUTZ, ERNEST PUTZ AND LOTTIE PUTZ, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued June 3, 1974.
Decided July 8, 1974.
*363 Before Judges CONFORD, HANDLER and MEANOR.
*364 Mr. Richard B. Thomas, Jr. argued the cause for defendants-appellants Putz (Messrs. Schenck, Price, Smith & King, attorneys).
Mr. Steven S. Radin argued the cause for plaintiff-respondent and cross-appellant Roxbury State Bank (Messrs. Sills, Beck, Cummis, Radin & Tischman, attorneys; Mr. Thomas J. Demski, on the brief).
Mr. Abraham Natovitz argued the cause for defendant-respondent O. David Fischer, receiver of The Clarendon.
The opinion of the court was delivered by CONFORD, P.J.A.D.
These are appeals by the foreclosing plaintiff bank and the holders of a second mortgage on real property and equipment of The Clarendon, a corporation engaged in the hotel and restaurant business in Hackettstown, and since September 1971 in statutory receivership, from a judgment of the Chancery Division in the mortgage foreclosure action. The judgment adjudicates the $160,000 first mortgage held by the bank a valid and prior lien only to the extent of $79,122.24; and the second mortgage of about $196,000 held by the Putz family to be totally unenforceable against the property. The opinion of the trial court is reported as Roxbury State Bank v. Clarendon, 123 N.J. Super. 400 (Ch. Div. 1973). It is fairly comprehensive of the pertinent facts, and we refer thereto for the background of this case, subject to such comments and qualifications as appear hereinafter.
Basically, the litigation springs from two coordinated transactions encompassing the sale of the hotel and restaurant business by Ernest Putz and Willie Putz (and their wives) to Codella and Douglas, and the partial financing of that transaction by plaintiff bank, in November 1970. The Putzes sold their shares in the corporation, turning over to the corporation at the same time a plenary liquor license *365 and a parking lot held by them personally, to Codella and Douglas for a base price of $300,000. This was adjusted at closing to about $250,000. Title to the shares was taken by the purchasers in their dummy corporation, Hook Mountain Industries (Hook Mountain). The Putzes received about $50,000 in cash and took back the second mortgage executed by The Clarendon, mentioned above, securing a Hook Mountain note for the balance of the price. Codella and Douglas put no money into the deal. The transaction was conditioned upon and made possible by a $160,000 10% note and mortgage executed by The Clarendon to the bank. The giving of that mortgage loan was contingent on the discharge out of the proceeds of the loan of two outstanding loans with the bank of Douglas-owned corporations amounting to some $34,000. About $45,000 in outstanding Clarendon loan obligations was also satisfied from the mortgage loan proceeds. At closing, the bank deducted a 5% fee of $8,000 from the mortgage proceeds for granting the loan.
The trial court held the Putz second mortgage void on the ground that a corporation has no power to mortgage its assets to finance the sale of its stock by a shareholder, as against a statutory receiver. 123 N.J. Super. at 409. It found that The Clarendon had received no consideration for the mortgage to the Putzes. It also held the bank mortgage invalid to the extent that the proceeds thereof were used as a down-payment on the stock sale ($50,000) and to pay off the prior debts to the bank of the Douglas corporations, as well as to the extent of a proportionate share of the loan fee. The mortgage lien was allowed as to the balance.
It is important in this case to note the fact that all commercial creditors of The Clarendon were paid off by the Putzes shortly after the closing of the stock and mortgage transactions. Thus, none of the obligations to creditors as of the time of the institution of the receivership was existent when the mortgages in question were executed.

*366 I
The Putzes asserted a crossclaim against the bank for fraudulent concealment from them of the use of part of the mortgage loan proceeds to discharge the prior loans of the Douglas corporations. On this premise they sought a subordination of the bank mortgage to their own or its nullification. They contended that they sold to Hook Mountain on the expectation that The Clarendon would net $60,000 for working capital from the bank loan proceeds, and that the bank concealed the fact that this sum would not be available because some of it was used to discharge the prior loans.
The trial court opinion, although noting the facts on which the claim was based (123 N.J. Super. at 406), failed to determine the issue, and the Putzes press it on the appeal. We conclude it is without merit. We assume, without deciding the fact issue, that the Putzes never saw the commitment letter from the bank dated October 9, 1970 mentioning the arrangement concerning the prior loans, Ibid., as testified to by them and contradicted by testimony of Codella. The letter from the bank to Mr. Schuman, attorney for the Putzes, was a true statement of the facts Schuman had inquired about, according to Mr. O'Neil, the bank representative, and Schuman was not produced as a witness to testify to any contrary version. O'Neil testified that Schuman simply inquired whether the bank had committed itself for a mortgage loan to Codella and Douglas and asked for a confirmatory writing, which he gave. The stipulation of the bank commitment to Codella and Douglas, that the borrowers were to pay off from the proceeds of the loan the prior obligations of Douglas' companies, was not a term of the note and mortgage to the bank, and O'Neil had no obligation to the Putzes to volunteer it. The latter were represented by independent counsel, and it was incumbent on him or them to inquire about the intended disbursement of the loan proceeds if that was material to the Putzes' deal with the purchasers of the stock.
*367 Moreover, we are convinced that the $34,000 disbursement from the loan proceeds in discharge of the debts of the Douglas companies would not, if disclosed, have affected the decision of the Putzes to sell out. Ernest Putz had retired from active conduct of the business several years previously. Willie Putz had become seriously ill and testified he had made up his mind he was "going to get out of the place before I get killed in the place." Thus the Putzes were intent on selling, and were absolutely dependent for consummation of the sale on the bank lending Codella and Douglas the wherewithal for the down-payment and discharge of the prior Clarendon obligations.
Accordingly, we find neither fraud on the part of the bank in relation to the Putzes nor any material reliance by the latter on the facts allegedly concealed in the letter from the bank to Schuman.

II
The invalidation of the Putzes' mortgage and the partial invalidation of the bank mortgage below were determined without reference to the New Jersey Business Corporation Act, enacted by the Legislature in 1968, N.J.S.A. 14A:1-1 et seq., effective January 1, 1969 (N.J.S.A. 14A:16-4), and generally referred to herein as the 1968 Revision. The appellants cited N.J.S.A. 14A:3-3 (empowering a corporation to give a guaranty not in furtherance of corporate purposes) to the trial court, but on appeal they cite and rely on several other provisions of the 1968 Revision as well. The bank represents to us that it also cited to the trial court the insolvency provisions of the act (N.J.S.A. 14A: 14-10, 11) and argued they were not operative to impair its lien. In any case, we have concluded that the interests of justice as well as of the sound development of the law in this area require us to consider the issues herein in the light of that Revision, it having been effective as of the date of the transactions here involved. The court has heard *368 argument and received supplemental briefs from the parties on these added issues.
A predominant object of the 1968 Revision was to expand and render more flexible the powers and uses of corporations in the light of modern business convenience and practice, thereby to attract incorporators to this State. See Report of the Corporation Law Revision Commission, June 20, 1968, at IX of N.J.S.A., Title 14A, "Corporations, General," 14A:1 to 14A:7. The Commission was careful to note, however, "The fact that management may exercise broader powers, if granted by the certificate of incorporation, or may act by simpler procedures does not mean that actions may be taken to the detriment of minority interests or creditors." Id. at XI.
Our study of the authorities cited by the trial court for its invalidation of the instant obligations, of the law generally applicable prior to the 1968 Revision, and of the Revision itself, satisfies us that the insolvency provisions of the latter, particularly in relation to so-called fraudulent conveyances, are now controlling in this area of the law and as to this particular litigation.
The former Corporation Act called for the invalidation of certain transfers by a corporation insolvent or contemplating insolvency, or suspending its business for lack of funds. N.J.S.A. 14:14-2. Stemming from L. 1896, c. 185, it subsisted until 1968 side by side with the Uniform Fraudulent Conveyance Act, adopted in New Jersey by L. 1919, c. 213. N.J.S.A. 25:2-7 et seq. See In re J. Rosen & Sons, 130 F. 2d 81 (3 Cir.1942). The latter, very similar to the provisions of the Bankruptcy Act, see 11 U.S.C.A. § 107(d) (2), was incorporated practically verbatim into the 1968 Revision. N.J.S.A. 14A:14-10. That section is a part of Chapter 14 of Title 14A, reading "Insolvency, Receivers and Reorganization." So far as here material, the section reads as follows:
*369 (1) Every transfer made and every obligation incurred by a corporation which is or will be thereby rendered insolvent, is fraudulent as to creditors without regard to its actual intent if the transfer is made or the obligation is incurred without a fair consideration.
(2) Every transfer made without fair consideration when the corporation making it is engaged or is about to engage in a business or transaction for which the property remaining in its hands after the transfer is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to its actual intent.
(3) Every transfer made and every obligation incurred without fair consideration when the corporation making the transfer or entering into the obligation intends to or believes that it will incur debts beyond its ability to pay as they mature, is fraudulent as to both present and future creditors.
(4) Every transfer made and every obligation incurred by a corporation with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors of the corporation, is fraudulent as to both such present and future creditors. [Emphasis added]
For present purposes, a most significant feature of this statutory scheme is that paragraph (1), as contrasted with the others, extends its benefits only to existing creditors, not those who came into being after the alleged fraudulent transaction. The parallel provision of the Uniform Fraudulent Conveyances Act has been so construed, TWM Homes, Inc. v. Atherwood Realty & Investment Co., 214 Cal. App.2d 826, 29 Cal. Rptr. 887 (D. Ct. App. 1963); and the contrast in the language identifying creditors in paragraphs (2), (3) and (4) as compared with paragraph (1), leaves no doubt about the matter. Any transfer "fraudulent" as to a creditor under N.J.S.A. 14A:14-10 is also "fraudulent" as to a receiver, except as to a purchaser for a fair consideration without knowledge of the fraud at the time of the purchase. N.J.S.A. 14A:14-11(1).
The cases, both in New Jersey and elsewhere antedating the 1968 Revision and voiding corporate conveyances or mortgages entered into for the benefit only of shareholders, directors or officers generally involve insolvency situations where it is inferable that at least some of the creditors represented *370 by the receiver or trustee had claims existing at the time of the transaction impugned. See, e.g., Pemberton v. Longmire, 194 Okl. 311, 151 P.2d 410 (Sup. Ct. 1944); Steph v. Branch, 255 F. Supp. 526 (E.D. Okl. 1966), aff'd 389 F.2d 233 (10 Cir.1968); In re Atlas Foundry Company, 155 F. Supp. 615 (D.N.J. 1957); Martin v. General Finance Co., 239 Cal. App. 2d 438, 48 Cal. Rptr. 773 (D. Ct. App. 1966); Catabene v. Wallner, 16 N.J. Super. 597 (App. Div. 1951); cf. Heidler v. Werner & Co., 97 N.J. Eq. 505, 508 (E. & A. 1925).[1]
When the question has been expressly posed as to whether post-transaction creditors, or a receiver on their behalf, could attack the validity of an obligation given by a corporation for a personal debt of an officer or stockholder, there has been a division of view on the point. Annotation, 47 A.L.R. 78, 80-81 (1927).
Notwithstanding the general principle that creditors, or the corporate receiver on their behalf, may attack transfers of corporate property made for the benefit of favored officers or shareholders, the cases clearly hold a corporation estopped to challenge such a transaction where all the shareholders have agreed to it and the rights of corporate creditors are not affected. Breslin v. Fries-Breslin Co., 70 N.J.L. 274 (E. & A. 1904); N.J. Car Spring and Rubber Co. v. Fields, 85 N.J.L. 217 (E. & A. 1913); Pine v. Hyed *371 Realty Corp, 145 N.Y.S.2d 548 (Sup. Ct. 1955), aff'd 1 A.D. 2d 952, 151 N.Y.S.2d 610 (App. Div. 1956); and see, Jennings v. Studebaker Sales Corp., supra (112 N.J.L. at 404). Taken together with the rule that a receiver stands in the shoes of the insolvent corporation and has no rights it does not have, Grobholz v. Merdel Mortgage Investment Co., 115 N.J. Eq. 411, 425 (E. & A. 1934); Bankers Trust Co. v. Maxson, 100 N.J. Eq. 1, 8 (Ch. 1926), the principle of estoppel aforestated poses the following inquiry. Precisely which creditors were entitled to be vindicated, under the law antecedent to the 1968 Revision, as to corporate actions unduly favoring an officer or director at corporation expense when all shareholders, as in the present case, concurred in the action? Could a receiver challenge such a transfer no matter how long before the inception of the insolvency, or no matter how unrelated causally the questioned corporate transaction and the incidence of insolvency?
We find no clear answers to these questions either in our own research or in the submissions of counsel. But we think it does not matter, in the light of the evidence that the Legislature in the 1968 Revision appears to have addressed the problem frontally in the recasting of the insolvency provisions of the former Corporation Act through N.J.S.A. 14A:14-10, 11, particularly specifying in which categories of "fraudulent" transfers relief should be available for existing creditors only, i.e., N.J.S.A. 14A:14-10(1), and in which for existing and future creditors alike, i.e., N.J.S.A. 14A:14-10(2), (3) and (4).[2]
*372 We see no evidence, in examining the 1968 Revision in entirety, that the draftsmen had in mind two distinct types of fraudulent transfer voidable by a corporate receiver  one encompassing all the situations falling within N.J.S.A. 14A:14-10, and regulated by that section  and another consisting only of transfers fraudulent as to the corporation itself, independent of its effect upon creditors, and not regulated by that section.[3] To the contrary, there is indication in the 1968 Revision that aside from adverse effects upon the interests of shareholders and creditors, particularly in the case of close corporations, N.J.S.A. 14A:1-1(3) (c), a tolerant approach was to be taken in respect of ultra vires acts, see N.J.S.A. 14A:3-2 and Commissioners' Comment-1968 thereon, at 155-56 of N.J.S.A., Title 14A, "Corporations, General," 14A:1 to 14A:7.
We consequently conclude that in the whole range of fraudulent (actual or imputed) transfers described in any of the subparagraphs of N.J.S.A. 14A:14-10, whether the transfer is to an officer, director or shareholder of the corporation or to anyone else, the right of the receiver to sue to impugn any such transfer for purposes of distribution of the corporate assets in his hands, as here, is controlled and qualified by that section and those immediately following it so far as pertinent. Transfers violative of N.J.S.A. 14A:14-10(1) are voidable by the receiver only if there are creditors whose present claims existed at the time of the questioned transaction. Per contra as to paragraphs (2), (3) and (4).

*373 III
In view of the conclusions in II, supra, and none of the present claims of creditors[4] having been in existence in November 1970, we have here no direct interest in whether it can be found from the proofs that the mortgage transactions in question, or either of them, "rendered" The Clarendon "insolvent," within N.J.S.A. 14A:14-10(1). But that subject may be indirectly relevant in relation to the several questions as to whether the making of the mortgages was accompanied by any of the operative criteria for invalidation specified in paragraphs (2), (3) or (4) of the section. See the discussion infra.

IV
Invalidation of the instant mortgages under paragraphs (2) or (3) of N.J.S.A. 14A:14-10 requires a finding that they were made without "fair consideration." Paragraph (4) of the section does not expressly require such a showing, but it does require "actual intent, as distinguished from intent presumed in law" to hinder, delay or defraud either present or future creditors. The receiver has not charged, nor has the trial court found, actual or specific intent on the part of the bank or the Putzes to defraud creditors. Nor do we. This provision must be read with N.J.S.A. 14A:14-11(3).
The inquiry consequently narrows to the applicability of paragraphs (2) and (3) of the fraudulent transfer section. We have no difficulty in concluding there was an absence of fair consideration in both mortgage transactions. To be a fair consideration, what the corporation gets in return for what it gives up by the "transfer" (which includes mortgages, N.J.S.A. 14A:14-1(j)) must be "a fair equivalent *374 therefor" or "not disproportionately small" and exchanged "in good faith." N.J.S.A. 14A:14-1(e).
As to the bank mortgage, to the extent that, to the bank's knowledge, The Clarendon was not beneficially receiving so much of the face amount of the mortgage as went to meet prior obligations of Douglas and to provide a down-payment to the Putzes on their sale of stock, the consideration received beneficially by the corporation was clearly not a fair equivalent of its obligation.
The case for absence of fair consideration is even more pointed as to the Putzes' mortgage. The corporation received from them only a liquor license and a plot of land. There is no reliable evidence in the record as to the value of these assets, but it obviously did not remotely approach the $196,000 lien imposed on The Clarendon's assets. See Zellerbach Paper Co. v. Valley National Bank, 13 Ariz. App. 431, 477 P.2d 550 (Ct. App. 1970).
We turn next to the other criteria for application of paragraphs (2) and (3), which, in the peculiar circumstances of this case, require treatment together. Under (2) the inquiry is whether the property remaining in the corporation's hands after the transfer was "unreasonably small capital" for the business it was to continue to conduct; under (3), whether the corporation (actually Douglas and Codella) intended or believed it would incur debts beyond its ability to pay as they matured. An approach to these questions requires consideration of the combined effect of both mortgages, as they were consummated at the same time and each obligee knew of the existence and burden upon the corporation attendant upon the other obligation.
While the trial court did not have the precise criteria of N.J.S.A. 14A:14-10 in mind, it made findings of fact relevant thereto. It held that out of both transactions The Clarendon netted only $40,854.52 for expenses of "renovation and operation" while encumbering all its assets for $356,000, "with an overwhelming debt service on the respective mortgages which the corporation could not meet." 123 *375 N.J. Super. at 408. It was also found that Codella and Douglas "syphoned off" substantial sums of corporate funds, and that "[i]n reality both corporations [Hook Mountain and The Clarendon] were insolvent in a statutory and in an equitable sense, on the day of the closing or shortly thereafter." Id. at 409. As to these observations, it will be seen that the court neglected to note that The Clarendon obtained, in addition to the cash noted, the liquor license and the parking lot. Further, the record of the trial does not clearly indicate the depletion of Clarendon assets by Douglas and Codella. This trial finding appears to have been derived from the receiver's depositions of these men, taken in the separate receivership action, in proceedings at which neither appealing mortgagee was represented nor on notice. The court's conclusion that the corporation was insolvent "on the day of the closing or shortly thereafter" seems also to have been materially dependent on such depositions. The mortgagees are entitled to an opportunity to meet and be heard in a hearing on remand as to any such proofs so far as they may be pertinent to the criteria for application of paragraphs (2) or (3) of N.J.S.A. 14A:14-10.
On what is before us and properly of record in this case we are unable to say with sufficient certainty to justify an original appellate finding of fact either that The Clarendon was left with unreasonably small capital in its hands to conduct its business or that The Clarendon (through Codella and Douglas) intended or believed that it would incur debts beyond its ability to pay as they matured. See Kearny Plumbing Supply Co. v. Gland, 105 N.J. Eq. 723 (Ch. 1930); same case at later phase, 8 N.J. Misc. 789, 151 A. 873 (Ch. 1930); Bertsch v. McBride, 58 F.2d 799 (6 Cir.1932), aff'g 58 F.2d 797 (W.D. Mich. 1930); Waukesha County Dept. of Social Services v. Loper, 53 Wis.2d 713, 193 N.W.2d 679 (Sup. Ct. 1972). For the guidance of the trial court we express our views, however, that (a) for purposes of application of statutory paragraph (3) the test of intention or belief is what the corporate managers believed or *376 reasonably should have believed under the circumstances, id., 193 N.W.2d at 681; and (b) in connection with both statutory paragraphs (2) and (3) the debt service requirements of both mortgages are proper factors to take into account in appraising the corporate business prospects and reasonable ability to meet accruing debts. In this latter regard, however, it should be kept in mind that the first payment of principal and interest on the Putz mortgage did not come due until a year after the date of the note and mortgage, and The Clarendon clearly became insolvent some time before that.
The case will have to be remanded for retrial as to these issues arising under N.J.S.A. 14A:14-10 (2) and (3). If the determinations go against the mortgagees on either of these issues, they will nevertheless be entitled to the protection of their liens, at least to the extent, in the case of the bank, of the amount so fixed by the trial court, with which we are in agreement, and, as to the Putzes, to the extent of the value of the liquor license and the parking lot as of the date of closing of the transaction. The trial court shall determine such values upon proofs. Since we have found both mortgagees to be without actual fraudulent intent they are entitled to these directions under N.J.S.A. 14A:14-11(3). Trust Co. of Orange v. Garfinkel, 107 N.J. Eq. 20, 26 (E. & A. 1930).

V
Both mortgagees rely upon N.J.S.A. 14A:3-3 to support their claims. This section provides that a corporation "may give a guaranty not in furtherance of its corporate purposes" when approved at a meeting of shareholders by a two-thirds vote. Such a guaranty may be secured by a mortgage on corporate property. We do not believe this section helps appellants.
In the first place, neither transaction challenged by the receiver constitutes a guaranty. A guaranty is an *377 agreement to be answerable personally for the debt of another. The bank loan was a principal obligation of The Clarendon, not a guaranty of an obligation of another. The Putz mortgage was only a security agreement, not an original undertaking at all by The Clarendon, either personally or as a guarantor of the Hook Mountain note obligation. Thus neither obligation meets the literal coverage of the statute.
In any case, the statutory section was designed only to prevent a corporate guarantor from invoking the defense of ultra vires when the guaranty was approved by the requisite number of shareholders and was "not intended to affect the application of the law of fraudulent conveyances." See Commissioners' Comment-1968, at 158 of N.J.S.A., Title 14A, "Corporations, General," 14A:1 to 14A:7. Thus the section invoked will not save either mortgage if voidable by the receiver under N.J.S.A. 14A:14-10.

VI
The bank also calls to its aid the provisions of N.J.S.A. 14A:6-11 which provides that a corporation may lend money to or guarantee any obligation of, "or otherwise assist," any officer or other employee of the corporation whenever any such loan, guaranty or assistance "may reasonably be expected to benefit the corporation." The section contains a proviso that if the person so assisted is a director, the transaction must be authorized "by the certificate of incorporation or a by-law adopted by the shareholders." Codella and Douglas were directors of The Clarendon, and we do not find that there was the requisite enabling provision in the certificate of incorporation or by-laws.
The bank mortgage was, moreover, not a loan to nor, as noted above, a guaranty of any obligation of Codella and Douglas. While it may have been intended to "assist" them, in a sense, we find no basis for a finding that the corporation, as distinguished from Codella and Douglas personally, could reasonably be expected to benefit from the transaction, particularly in the context of the inseparable conjunction of *378 the debt burden imposed on the corporation by the Putz-Hook Mountain contract.
An examination of the Commissioners' Comments-1968 on this section reveals that it had a purpose altogether foreign to the type of transaction here involved. See pages 330-331 of N.J.S.A., Title 14A, "Corporations, General," 14A:1 to 14A:7.
While conceding in its brief that in respect of the loan proceeds which the bank used to repay itself on the outstanding Douglas loans, the trial court in the exercise of its equity powers "could eliminate this portion of the mortgage," the bank contends that it was not on notice as to any "per se" invalidity of the loan in respect of the portion of the loan proceeds which went as part payment to the Putzes for their transfer of stock. It cites in support of its position O'Connor v. First Bank & Trust Co., 12 N.J. Super. 281 (App. Div. 1951), which held that a bank which accepts for deposit to the account of a director of a corporation a check payable to the corporation and endorsed to the director by himself and another director, as authorized by a corporate resolution on file with the bank, is not on notice as to any corporate illegality underlying the transfer of the note by the corporation to the director. The case is far from authority for the claimed immunity of plaintiff bank here.
The testimony at trial shows that Mr. O'Neil, who negotiated the matter for the bank, had discussed the transaction, including the sale of the Putz stock, not only with Codella and Douglas, but with at least one of the Putzes and with their attorney Schuman. He admitted he had seen a copy of the Putz-Hook Mountain sale contract either prior to or at the closing of the bank transaction. That instrument called for a down-payment on account of the sale of the shares of stock of $50,000 to the Putzes. The bank was to act as escrowee of the stock in the Putz transaction. We entertain no doubt, and find, that O'Neil knew that the down-payment to the Putzes was to come out of the mortgage proceeds the bank was advancing to The Clarendon. *379 He, and the bank through him, were imputable with knowledge of the elementary principle that it is prima facie illegal for corporate funds to be paid out to defray the expense of a transaction for the benefit of a shareholder, officer or director.
We do not here hold, contrary to O'Connor v. First Bank & Trust Co., supra, that a bank which receives a negotiable instrument in due course is under a duty of inquiry, where the corporate payee of the instrument has endorsed it over to a director, to inquire as to the legality of the transaction between the corporation and its director before making payment on it. We do hold that a bank lending money on a mortgage to a corporation, which knows that a substantial portion of the mortgage proceeds will be used to finance a sale of the corporate stock by a shareholder to third persons, is on notice that the mortgage is to that extent voidable, and such a mortagage is made at the peril of invalidation at the instance of creditors under the corporation act. Cf. In re Atlas Foundry Co., supra, 155 F. Supp. at 618.
The judgment is modified to the extent indicated herein and the cause is remanded to the Chancery Division for further proceedings consistent with this opinion. No costs to any party on this appeal.
NOTES
[1] The present action is not one by the receiver to recover damages or obtain restitution from directors or officers who have wrongfully diverted corporate assets for their own benefit, see Hays v. Pierson, 65 N.J. Eq. 353 (E. & A. 1899); or from a knowing recipient of corporate funds used to meet the obligation of an officer or director, particularly where less than all the shareholders have consented to the payment, see Jennings v. Studebaker Sales Corp., 112 N.J.L. 399 (E. & A. 1934). The cited cases held that the fact of corporate solvency or the absence of effect of the transaction upon creditors as of the time of its occurrence were not necessarily material to the receiver's rights; and we have no occasion here to consider the continued viability of such decisions as against the 1968 Revision. See N.J.S.A. 14A:14-5; 14A:3-2. See also the discussion infra of transactions consented to by all shareholders.
[2] However, we entertain no doubt that if there are some creditors whose claim goes back to the time of a fraudulent transaction voidable under N.J.S.A. 14A:14-10(1), then all creditors in the same class, whether or not with claims existing as of that time, are entitled to share equally in the insolvency distribution. N.J.S.A. 14A:14-21(1). Cf. Cohen v. Hodes, 54 F.2d 680, 681 (E.D.N.Y. 1931). In the instant case, as noted, none of the present creditors have claims antedating the challenged mortgages.
[3] No problem of statutory construction is here presented with respect to relief for dissenting shareholders in the instance of abuse of corporate assets by other shareholders as there were no dissenting shareholders in this case. Further, this is not a suit for damages against officers or directors for improprieties. See N.J.S.A. 14A:3-2(b).
[4] We are advised by the receiver that claims of creditors exclusive of the mortgages here in question aggregate $92,152.87. After payment of the amount adjudicated below as due the bank and other expenses, including taxes, the receiver has in his hands $55,873.16.