WILLIAM J. McDADE, JR., ET AL. [1], Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent McDade v. Commissioner
Docket Nos. 6539-82, 6542-82, 6543-82, 6544-82.
United States Tax Court
T.C. Memo 1987-56; 1987 Tax Ct. Memo LEXIS 52; 52 T.C.M. (CCH) 1512; T.C.M. (RIA) 87056; January 26, 1987. William J. McDade, Jr., pro se in docket Nos. 6539-82, 6544-82. Michael S. *54 Adelman, for the respondent. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: In these consolidated cases, respondent determined deficiencies in, and additions to, petitioners' Federal income taxes as follows: PETITIONER
YEAR
DEFICIENCY
§ 6653(b) [2]
§ 6654
§ 6653(a)
§ 6651(a)
William J.
1972
$21,549.64
$10,774.82
$658.75
$1,077.48
$5,387.41
McDade, Jr.
1973
76,202.87
38,101.44
2,421.74
3,810.14
19,050.72
1974
3,370.12
1,685.64
75.49
168.51
842.53
Jodi Lym
FYE 1974
9,098.75
4,549.38
Enterprises, Inc.
FYE 1975
8,736.21
4,368.11
Pine Lake
FYE 1974
9,098.75
4,549.38
454.29
2,271.43
Inn, Inc.
FYE 1975
8,736.21
4,368.11
436.81
2,184.05
William J. &
1976
32,866.53
16,433.27
Clare T. McDade
After concessions by the parties, the issues for decision are: (1) the amount of unreported bribery income William *55 J. McDade, Jr. ("McDade") received in 1972 and 1973; (2) the amount of unreported profits McDade realized from the operations of his sole proprietorship, "Bill's Cold Cuts", in 1972 and 1973; (3) the amounts of unreported rental income McDade received in 1972 and 1973; (4) whether McDade received constructive dividends from Pine Lake Inn, Inc. ("Pine Lake") in 1972, 1973 and 1974; (5) the amount of unreported income Pine Lake received from its operations during its 1974 and 1975 fiscal years; (6) whether the entire $12,461.42 received by Pine Lake on the sale of property in 1975 is ordinary income; (7) whether Jodi Lynn Enterprises, Inc. ("Jodi Lynn") is liable under section 6901 as a transferee of the assets of Pine Lake for determined 1974 and 1975 deficiencies and/or additions to the taxes of Pine Lake; (8) whether McDade and his wife, Clare McDade ("Clare"), realized taxable gain on the sale of their stock in Jodi Lynn in 1976; (9) whether assessment of McDade's and Clare's 1976 tax liability is time barred; and (10) whether any or all of the petitioners are liable for additions to tax for fraud, and/or failure to pay estimated taxes, or in the alternative, for additions to tax *56 due to negligence or intentional disregard of rules and regulations or for the failure to file tax returns. FINDINGS OF FACT - General Some of the facts have been stipulated and with the exception of one, discussed infra, are so found. At the time they filed their petitions, and during the taxable years in issue, William J. McDade and Clare McDade, husband and wife, resided in Lindenwold, New Jersey. For convenience, William J. McDade, Jr. will be referred to by his surname and Clare McDade by her first name. Pine Lake Inn, Inc. ("Pine Lake") and Jodi Lynn Enterprises, Inc. ("Jodi Lynn"), both New Jersey corporation, maintained their principal places of business in Lindenwold, New Jersey at the time their respective petitions were filed. For convenience, due to the number of issues involved, our remaining findings of fact and opinion will be combined by issue. Issue 1. Bribery Income
FINDINGS OF FACT From January 1969 until January 1976, McDade held elective positions within the Borough of Lindenwold, New Jersey. He first served as one of six Borough council members, acting as council president in 1970 and 1971. Then in January, 1972 through January 1, 1976, he *57 served as its mayor. McDade was also a member of the Borough's Planning Board (from January, 1972 through June, 1974) and served as a member of its Municipal Utilities Authority (from March, 1971 until October, 1973). These positions placed McDade in a powerful and influential situation relative to builders and developers who needed local governmental approval before they could undertake construction of residential or commercial projects within Lindenwold. McDade used these positions for his own financial gain. Following the November, 1969 Borough election, McDade and three of his colleagues met at McDade's house. At that meeting, it was decided that: (1) the four would designate McDade as council president; (2) builders or developers seeking zoning changes or permits would have to pay in order to obtain the desired result; (3) the four would vote as a block on those changes or permits upon which bribes or kickbacks had been arranged; and (4) McDade would be the designated person to whom all bribe payments would be made. A significant amount of the bribes received by McDade came from John Piper and Nelson Shaw, who acted as middlemen on behalf of Morton Silver and Richard Kahr. *58 Both Silver and Kahr were involved in the development and construction of residential projects in the Lindenwold area. On August 19, 1976, a State Grand Jury returned a multi-count criminal indictment charging McDade and five other defendants with conspiracy, bribery and misconduct in office for their participation in the Lindenwold municipal bribery transactions. McDade pleaded guilty to the charges. [3]
In his plea of guilt, McDade admitted receiving approximately $14,000 in bribes during 1972 and 1973 from Piper and Shaw. At the trial of this case, McDade admitted receiving a total of $65,000 from Shaw and/or Piper for his activities ($35,000 in 1972 and $30,000 in 1973), but he claims to have given most of the money to others. Respondent asserts that McDade received substantially more than that to which he admitted and that he kept $25,000 in 1972 and $98,000 in 1973. Such amounts, respondent asserts, constitute unreported taxable income in the year of receipt. OPINION Our task is to determine the amount of unreported *59 bribery income received by McDade during 1972 and 1973. Respondent attributed to McDade the receipt of all bribes paid; McDade claims he kept only a fraction of the amount and passed the rest onto others. The burden is on McDade to prove his claim. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). McDade's guilty plea to the multi-count indictment for bribery, conspiracy and misconduct in office rendered by the Grand Jury (and subsequent conviction on such charges) collaterally estops him from disputing the elements of the offenses that are pertinent to the issues in this proceeding. Tomlinson v. Lefkowitz,334 F.2d 262, 264 (5th Cir. 1964), cert. denied 379 U.S. 962 (1965); Arctic Ice Cream Co. v. Commissioner,43 T.C. 68, 75 (1964). However, McDade may contest the amount of unreported income which respondent charges him with receiving if said amount was not an element of the crime to which he confessed. In any event, his admissions with respect to the amount of income received are strong evidence that such amount was received. *60 Barrasso v. Commissioner,T.C. Memo. 1978-432, affd. sub nom. De Cavalcante v. Commissioner,620 F.2d 23 (3d Cir. 1980). In the prior proceeding, McDade admitted that he received at least $14,000 in bribery income in 1972 and 1973. Four council members were involved in the bribery scheme, including McDade. To assure passage of the proposals upon which bribes had been arranged, concerted action would have to have been taken by at least four of the six council members. We find it incredible that these individuals would undertake to perform such illegal and nefarious activities without demanding recompense for their participation. Indeed, as mayor, McDade would have had no vote with respect to the activities for which the bribes were accepted; only the other members of the "block" were able to insure that the promised measures were taken. The record contains numerous contradictory statements by McDade. However, we have observed his demeanor as a witness and we questioned him on various points with regard to this issue. We believe that he did not receive the amount of bribery income respondent attributed to him. On the other hand, we believe *61 that he received more than that to which he admitted by virtue of his guilty plea. Using our best judgment, we find that McDade retained $35,000 as bribery income during 1972 and $30,000 during 1973, all of which was unreported. Issue 2. Bill's Cold Cuts
FINDINGS OF FACT During 1972 and 1973, and until March of 1974, McDade was the sole owner of Bill's Cold Cuts (Bill's), a delicatessen in Lindenwold. This business was run solely by the McDade family. McDade maintained little in the way of records with respect to the income and expenses of Bill's during its periods of operation. McDade's records pertaining to Bill's consisted of journals entitled "Dome Simplified Weekly Bookkeeping Record" ("Dome Records") which were kept on a cash basis. Although a business bank account existed, receipts from the business were also deposited in other accounts held by McDade in the names of himself and/or his wife. McDade admitted that he removed approximately $200-$300 per week from the daily cash receipts generated by the delicatessen. In addition, most of the family's groceries were obtained from Bill's. In March of 1974, McDade sold the inventory and goodwill of Bill's to *62 his in-laws, John and Ann Fletcher. The Fletchers made 32 payments of $125 each (totaling $4,000) to McDade in connection with their purchase of Bill's. In November, 1974, the business failed and the Fletchers transferred Bill's (with less than $1,000 in inventory) back to McDade. Respondent determined that McDade's Dome Records did not adequately reflect the gross receipts of the business during 1972. Therefore, respondent used the bank deposits analysis method to reconstruct the business' gross receipts for 1972. By this method, respondent determined that Bill's had gross receipts in 1972 of $183,731.24. Using both the Dome Records and a net profit percentage derived from operations for the three immediately preceding years, [4] respondent determined that the cost of goods sold for 1972 was $136,051, and that other business expenses were $24,474.99, leaving a net profit for 1972 of $23.205.25. In analyzing Bill's income and expenses for 1973, respondent had little to *63 rely on except the Dome Records, as a fire at McDade's bank had destroyed all other pertinent records. From the Dome Records, respondent determined sales for 1973 of $165,382. Using figures supplied by McDade's accountant, respondent determined that the cost of goods sold for 1973 was $135,252.86 and that other business expenses were $4,539.59, resulting in a net profit for 1973 of $25,589.55. McDade claims that respondent erred in determining Bill's profit for 1972 and 1973. OPINION Petitioner bears the burden of proof as to the correctness of respondent's determination with regard to this issue. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). If a taxpayer believes that respondent's method of computation was unfair, inaccurate or arbitrary, the burden is upon the taxpayer to show such unfairness, inaccuracy or arbitrariness by a preponderance of the evidence. Cummings v. Commissioner,410 F.2d 675, 679 (5th Cir. 1969); Gordon v. Commissioner,63 T.C. 51, 73 (1974). Respondent is not bound to accept a taxpayer's records as full and complete, even if on their face they appear to be so. *64 Holland v. United States,348 U.S. 121 (1954), affg. 209 F.2d 516 (10th Cir. 1954); Harper v. Commissioner,54 T.C. 1121, 1129 (1970). In the instant case, respondent was provided with several indications that McDade's records were not complete: (a) McDade's admission that money was taken from Bill's for personal expenses; (b) regular depletion of inventory for the needs of McDade's family; and (c) commingling of business receipts with McDade's personal accounts. Under these circumstances, respondent was justified in using alternative methods to reconstruct Bill's receipts, income, cost of goods sold, and expenses.[5]
McDade has not carried his burden of proving that respondent's determination was erroneous. Accordingly, we sustain respondent's determination that Bill's profits in 1972 and 1973 were $23,205.25 and $25,589.55, respectively. Issue 3. Rental Income
FINDINGS OF FACT In *65 December, 1971, McDade acquired property located at 225 Ashborne Avenue in Lindenwold, New Jersey. He subsequently rented the property from April, 1972 until it was sold in October, 1973. [6] McDade also owned property at 1 Sutton Avenue in Lindenwold which was acquired in late 1972 and which was leased in December of 1972 for at least one year. Respondent determined that McDade received a total rental income from the Ashborne and Sutton properties in 1972 and 1973 of $1,235 and $835, respectively. McDade admits that he received rental income from both properties during 1972 and 1973, but he again contends that he received less than that determined by respondent. Further, respondent disallowed for lack of substantiation deductions for *66 real property taxes and other expenses claimed by McDade with respect to the Ashborne property. McDade not unexpectedly disputes this disallowance. OPINION Again, petitioner bears the burden of proving that respondent's determination is incorrect. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). McDade asserts that the rental income from the Ashborne property was only $40-$60 per month; however, he offered no evidence to support his assertion other than his own testimony which we did not find persuasive. As such, we find the rental to be that asserted by respondent, i.e., $80 per month for the Ashborne property. However, as the property was not rented until approximately April 1, 1972, we hold that McDade received rental income from the Ashborne property of $720 in 1972 and $720 in 1973. As to the Sutton property, the lease agreement of December 8, 1972 provided for rental of $275 month commencing on that date. McDade presented no evidence to controvert that the amount received was less than the stated monthly rental provided for in the lease. However, respondent did not provide us with any indication as to how he arrived at the total combined rental *67 income for both properties of $1,235 and $835. As such, we feel constrained to limit the rental income to the extent set forth in respondent's notice of deficiency. Thus, we find that McDade received rental income from the Sutton property of $515 ($1,235 - $720 = $515) in 1972 and $115 ($835 - $720 = $115) in 1973. McDade claims that respondent erred in disallowing the deductions for real estate taxes and expenses paid with respect to the Ashborne property. As McDade again failed to substantiate payment of such items, we sustain respondent's disallowance of such claimed deductions. [7]
*68 Issue 4. Pine Lake
(a) Taxable Dividend FINDINGS OF FACT In 1972, McDade and Clare transferred land and a building located at 2119 White Horse Pike in Lindenwold, New Jersey, to Pine Lake in exchange for part of its stock. The property transferred was subject to a mortgage (assumed by Pine Lake) in favor of the Nativity Club in the amount of $40,000. In 1973, McDade purchased from Frank and Eleanor Vettese their stock in Pine Lake, thereby acquiring 100 percent stock ownership of Pine Lake. In exchange for the stock, McDade paid the Vetteses $10,000 in cash and executed a note in the amount of $55,000, which was secured by a mortgage on property owned by Pine Lake. During the years in issue, Pine Lake made payments due and owing on both mortgage obligations. Respondent determined that such mortgage payments by Pine Lake constituted income (either as salary or dividend) to McDade. As such, respondent increased McDade's income by $957.13 for 1972; $3,026.34 for 1973; and $9,200.32 for 1974. McDade argues that Pine Lake's payment on the mortgage obligations were loans to him by the corporation, and that he repaid the corporate loans. OPINION *69 As with several of the other issues involved in this case, petitioner bears the burden of proof with regard to this issue. Welch v. Helvering,supra;Rule 142(a). In general, the payment of personal obligations by a corporation for or on behalf of a shareholder constitutes a constructive dividend to the shareholder. Benjamin v. Commissioner,66 T.C. 1084, 1115 (1976), affd. 592 F.2d 1259 (5th Cir. 1979). The parties stipulated that both the Nativity Club and Vettese mortgages were personal obligations of McDade. We are not bound, however, by the parties' stipulation if the facts presented at trial are contrary to those stipulated. Jasionowski v. Commissioner,66 T.C. 312, 318 (1976). The Nativity Club mortgage encumbered the White Horse Pike property when the property was transferred by the McDades to Pine Lake. Pine Lake assumed satisfaction of the Nativity Club mortgage as part of the property for stock transfer. Thus, after such transfer, as between Pine Lake and the McDades, the mortgage obligation was no longer a personal obligation of the McDades.We find, therefore, that for the years in issue, payments *70 made on the Nativity Club mortgage by Pine Lake did not constitute a dividend to McDade. The Vettese mortgage, however, arose from the purchase of stock by McDade from the Vetteses. That mortgage represented collateral for the balance due by McDade to the Vetteses. Pine Lake was not a party to the transaction. Therefore, the Vettese mortgage was a personal obligation of McDade, and payments by Pine Lake on that mortgage during the years in issue were for the benefit of McDade. McDade argues that the mortgage payments by Pine Lake were loans by Pine Lake to him and that he repaid such loans. Whether withdrawals from a corporation to a shareholder or corporate payments to others on behalf of a shareholder constitute loans or taxable distributions depends upon the attendant facts and circumstances. Roschuni v. Commisioner,29 T.C. 1193, 1202 (1958), affd. 271 F.2d 267 (5th Cir. 1959). We found the following factors to be of importance in Roschuni in the determination of such an issue: the control exercised by the stockholder over the corporation; the existence or non-existence of notes or acknowledged indebtedness between the stockholder and *71 the corporation; the type of expenses for which the funds were used; whether any security was given for repayment, interest charged, or time certain set for repayment; and whether the alleged indebtedness was carried on the books of the corporation. See Atlanta Biltmore Hotel Corp. v. Commissioner,349 F.2d 677 (5th Cir. 1965). The record in this case does not support McDade's position. McDade, the dominant shareholder of Pine Lake, admitted that he did not give Pine Lake a promissory note evidencing the "loans." He asserted that he made some payments to Pine Lake on the purported loans, but he was unable to produce any documentary evidence supporting this allegation. Further, those books and records of Pine Lake which were available did not show any entries with respect to a repayment of a loan by McDade during the periods in issue. With these considerations in mind, we cannot find that the payments made by the corporation constituted loans to McDade. Rather, we find that the payments were distributions by Pine Lake to McDade with respect to his stock. (b) Pine Lake's Income- 1974 and 1975 FINDINGS OF FACT Although Pine Lake operated a tavern business *72 during its 1974 and 1975 fiscal years, it did not file returns for either of those years. As with Bill's, McDade kept minimal records of the operations of Pine Lake. Those which were kept were in the Dome Records. However, the Dome Records only covered the period January, 1974 through March, 1975, inclusive; thus, complete records for Pine Lake were not available for either of the fiscal years in issue. To determine Pine Lake's sales, cost of goods sold, other business expenses and the resulting net taxable income for 1974, respondent used those records available for the last six months of the fiscal year (i.e., February 1974 through July 31, 1974). Respondent determined that Pine Lake had taxable income of $16,248.70 for this six-month period, and he doubled that figure to arrive at the net taxable income of $32,497.40 for the entire fiscal year. For fiscal year 1975, respondent used a similar approach as that used for fiscal year 1974. Income and expense figures were derived from the Dome Records for the six-month period August, 1974 through January, 1975. However, respondent did not use the fiscal year 1975 sales figures reflected in the Dome Records since he felt the *73 amount of sales so reflected were disproportionately low. Rather, he used the net profit percentage from the corporation's prior fiscal year and by applying that percentage to sical year 1975 purchases, he determined that Pine Lake's profit for its fiscal year 1975 was $23,258.24. Respondent computed Pine Lake's fiscal year 1975 profits on the basis of a full fiscal year. In fact, Pine Lake sold its assets and ceased operations on July 22, 1975, nine days prior to what otherwise would have been its fiscal year end. McDade admits that Pine Lake had a profit for fiscal year 1974 and 1975, but he claims the amount of such profits were not nearly as large as those determined by respondent. OPINION Our consideration of this issue parallels that previously discussed with regard to the determination of the profits for Bill's. The burden of proof is upon the taxpayer to show that respondent's income determination is erroneous. Cummings v. Commissioner,410 F.2d 675, 679 (5th Cir. 1969); Gordon v. Commissioner,63 T.C. 51, 73 (1974). Pine Lake presented little evidence to bolster its contention that respondent overstated its profits for fiscal *74 years 1974 and 1975. Respondent used the Dome Records as the starting point in calculating Pine Lake's income for years in issue. As the records were incomplete, he properly utilized indirect methods to ascertain necessary data to compete his calculation. See section 446. Even if the records presented were complete as to each fiscal year involved, respondent would not be bound to accept such records at face value. Holland v. United States,supra;Harper v. Commissioner,supra.This leaves us to decide whether the amounts determined by respondent were correct. The only evidence presented by petitioners with respect to this issue was McDade's testimony that Pine Lake earned only a small profit in the years at issue and that sales in fiscal year 1975 were $133,000, which we note approximates the amount ($137,138) used by respondent in his calculations. Because petitioners did not meet their burden of proof, we sustain respondent's determination that Pine Lake's taxable income for fiscal year 1974 was $32,497.40. We would also sustain respondent's determination with respect to Pine Lake's taxable income for fiscal year 1975 but for the *75 fact that Pine Lake ceased operations on July 22, 1975, and respondent's calculations were based on Pine Lake's operations continuing until July 31, 1975. Thus, to reflect the fact that Pine Lake ceased operations nine days prior to what otherwise would have been its fiscal year end, we find that Pine Lake's taxable income for its fiscal year 1975 was $22,684.75 ($23,258.24 - $573.49 (9/365 X $23,258.24)). (c) Payment on Sale of Tavern FINDINGS OF FACT On June 19, 1975, Pine Lake entered into an agreement to sell all of its assets, including its inventory, liquor license and goodwill, to Danza Enterprises, Inc. ("Danza"). Settlement occurred on July 22, 1975, with Pine Lake receiving (in exchange for all of its assets) a cash down payment of $12,461.42 and Danza's note in the amount of $115,000. In addition, Danza agreed to continue paying the Nativity Club and Vettese mortgages. Respondent determined the entire cash down payment of $12,461.42 was ordinary income to Pine Lake. Pine Lake contends that the entire gain it realized on the sale was not ordinary income. OPINION A sale of the assets of a business, whether as a going concern or on a piecemeal basis, requires *76 an analysis of each individual asset sold to determine the character of gain or loss. U.S. Mineral Products Co. v. Commissioner,52 T.C. 177 (1969); sections 1221 and 1231. The assets conveyed by Pine Lake to Danza must be segregated into those assets which are available for capital gains treatment and those which are not. Upon a division of the assets into such categories, a determination of the amount and character of recognizable gain or loss may then be accomplished. Petitioner bears the burden of proving respondent's determination on this issue to be incorrect. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Pine Lake failed to provide us with any evidence as to the exact nature of the assets transferred, or its basis in those assets. As such, based on the record before us, we cannot determine the amounts to be afforded capital gains treatment (e.g., goodwill) or ordinary income treatment (e.g., inventory) to Pine Lake. The failure of Pine Lake to carry its burden of proof on this issue is thus fatal to its argument. We therefore sustain respondent with respect to this issue. Issue 5. Transferee Liability of Jodi Lynn Enterprises, *77 Inc.
FINDINGS OF FACT In December, 1975, Danza instituted a suit in the New Jersey Superior Court requesting a rescission of its June, 1975 sales contract with Pine Lake. Danza claimed that Pine Lake (and McDade) had misrepresented the volume of Pine Lake's business prior to the sale. The parties ultimately settled the suit, and a judgment of dismissal without prejudice was entered on June 30, 1976. Upon dismissal of the suit, Danza's attorneys notified Pine Lake and McDade that they intended to place the business into receivership and to default on the mortgages upon which Danza was liable. To avoid this course of action, it was agreed that Danza would reconvey to Pine Lake, or its nominee, the assets acquired on July 22, 1975, subject to existing mortgages and additional liabilities incurred by Danza subsequent to July 22, 1975. On August 6, 1976, Clare and her daughter, Patricia Ann McDade ("Patricia"), formed Jodi Lynn. [8] The stock of Jodi Lynn was egually owned by Clare and Patricia. Patricia owned her stock as a nominee of her father, and was subject to his direction and control with respect to the stock. *78 On August 13, 1976, Danza transferred to Jodi Lynn, as nominee for Pine Lake, all of its assets (i.e., in essence, all the assets Danza acquired from Pine Lake), subject to the existing mortgages and liabilities (including Danza's obligation to Pine Lake). The only consideration given to Danza in exchange for the assets was the understanding that Jodi Lynn would pay off the existing encumbrances on the assets transferred. After the August 13, 1976 transfer, Pine Lake had no assets and ceased all its corporate activities. Respondent claims that when Danza agreed to reconvey its assets to Pine Lake or its nominee, Pine Lake had "property rights", as defined under New Jersey law, and that Pine Lake transferred these property rights to Jodi Lynn without fair consideration. Thus, respondent contends, under section 6901 and New Jersey law, Jodi Lynn is a transferee of the assets of Pine Lake for purposes of any tax or additions to tax deemed owing for the years in issue. Jodi Lynn disagrees. OPINION The burden of proving transferee liability is upon respondent. Section 6902(a); Rule 142(d). Section 6901(a)(1)(A) provides that respondent may, in some circumstances, collect the *79 unpaid tax liability of a transferor from a subsequent transferee. A transferee may be a donee, heir, legatee, devisee, assignee, or other distributee. Section 6901(h). The existence and extent of transferee liability is governed by State law. Commissioner v. Stern,357 U.S. 39, 45 (1958); United States v. Bess,357 U.S. 51 (1958). As such, New Jersey law governs our determinations with regard to this issue. We previously determined the tax liability of Pine Lake (with the exception of additions to tax yet to be discussed). We need now only examine the issue of Jodi Lynn's liability as a transferee. To establish transferee liability, respondent must prove the following elements: (1) a transfer of property occurred; (2) the transfer was without adequate consideration; (3) the transferor (or preceding transferor) was insolvent at the time of the transfer or was made insolvent by the transfer; (4) the value of the property transferred; and (5) the transferor (or preceding transferor) has not paid the asserted tax. *80 Alonso v. Commissioner,78 T.C. 577, 580 (1982), citing Moran v. Commissioner,45 T.C. 528 (1966). New Jersey law provides that a transfer of property by a corporation which is, or will be, rendered insolvent by such transfer, is fraudulent as to creditors without regard to the transferor's intent if the transfer is made or an obligation is incurred without fair consideration, and is voidable with respect to those creditors. N.J. Stat. Ann. section 14A:14-10 (West 1969). [9] See generally Roxbury State Bank v. The Clarendon,129 N.J. Super. 358, 324 A.2d 24 (1974). A creditor, as defined by the statute, means the holder of any claim, of whatever character, against the corporation. N.J. Stat. Ann. section 14A:14-1(b) (West 1969). The term "property" is defined to include real, tangible and intangible property, and all rights, claims and franchises of every nature. N.J. Stat. Ann. section 14A:14-1(g) (West 1969). As provided in N.J. Stat. Ann. section 14A:14-1 (West 1969), "* * * 'transfer' means the sale and every other method, direct or indirect, *81 of disposing of or parting with property or with an interest therein * * *." On July 22, 1975, Pine Lake transferred all of its assets (subject to encumbrances and liabilities) to Danza, in return for a down payment of $12,461.42 and Danza's note in the amount of $115,000. These assets and liabilities were subsequently reconveyed by Danza to Jodi Lynn as the nominee of Pine Lake on August 13, 1976. We find that N.J. Stat. Ann. section 14A:14-1 (West 1969) embraces these "direct or indirect" transfers; the first element of transferee liability has therefore been shown. N.J. Stat. Ann. section 14A-14-1(e) (West 1969) provides: (e) "fair consideration" is given for property or an obligation when, in exchange for such property or obligation, as a fair equivalent therefor, and in good faith, property is transferred or an antecedent debt is satisfied; or when such property or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared *82 with the value of the property or obligation obtained; * * * In the transfer by Pine Lake to Danza, fair consideration existed as Pine Lake received a cash down payment and Danza's note. In the transfer by Danza to Jodi Lynn, fair consideration also existed because Jodi Lynn agreed to the continued payment of all liabilities and mortgages encumbering the transferred assets, and the amount of such liabilities and mortgages were not disproportionately small as compared with the value of the transferred assets. The second element of transferee liability, inadequate consideration, therefore was not present in the nominee transfer from Danza to Jodi Lynn. See Roxbury State Bank v. Clarendon,supra;Alonso v. Commissioner,78 T.C. 577 (1982). As there was adequate consideration for the transfer of assets from Danza to Jodi Lynn, the transaction fails to meet one of the essential elements required for a finding of transferee Jodi Lynn is not liable as a transferee pursuant to section 6901 for the tax deficiencies asserted by respondent against Pine Lake for its fiscal years ending 1974 and 1975. Issue 6. Gain on Sale of Jodi Lynn Stock
*83 FINDINGS OF FACT On October 14, 1976, Clare and Patricia entered into an agreement to sell all their stock in Jodi Lynn to Robert Phillips and Thomas Haney for a combination of cash, the purchasers' note and the purchasers assuming existing mortgages and liabilities, all of which aggregated $225,000. The purchasers also assumed payment of the McDades' obligation to the Vetteses, which at the time was $33,179.80. Settlement occurred on October 28, 1976. Respondent computed the McDades' basis in the stock [10] sold to be $82,500; and petitioners do not dispute that determination. Respondent determined that the McDades realized a capital gain from the sale of the Jodi Lynn stock in the amount of $142,500 ($225,000 - $82,500) which they failed to report in 1976. The McDades claim they had no recognizable gain. OPINION There is no dispute but that Jodi Lynn stock ostensibly owned by Patricia was in actuality owned by McDade. *84 To determine gain or loss from the sale of property, two elements must be determined: (1) the amount realized on the sale; and (2) one's adjusted basis in the property sold. Section 1001. The parties agree that the McDades' adjusted basis in the stock sold was $82,500. Thus, to determine the amount of gain or loss from the sale of the Jodi Lynn stock, we must determine the "amount realized." The "amount realized" on the sale of the Jodi Lynn stock includes not only the cash and other property received (as petitioners contend) but also the amount of all obligations of the sellers assumed. See section 1.1001-2(a)(1), Income Tax Regs.; Commissioner v. Tufts,461 U.S. 300 (1983); Crane v. Commissioner,331 U.S. 1 (1947). Here, the McDades received cash and other property totalling $38,283.17 and the sellers assumed a $33,179.80 debt owed by the McDades to the Vetteses. Thus, the amount realized by the McDades from the sale of the Jodi Lynn stock was $71,462.97 ($38,283.17 + $33,179.80). [11] Since the parties agree that the McDades' adjusted basis was $82,500, they sustained a capital loss of $11,037.03 from the sale of the stock. *85 Issue 7. Statute of Limitations
FINDINGS OF FACT McDade and Clare timely filed a joint 1976 tax return. On August 3, 1979, they executed a Form 872 (Consent To Extend The Time To Assess Tax) extending the period for assessment of tax due for 1976 to December 31, 1980. The McDades subsequently extended the last date on which an assessment for 1976 could be made until December 31, 1981. On December 21, 1981, respondent mailed a notice of deficiency setting forth his determination of the McDades' 1976 tax liability. Petitioners claim that any assessment for their 1976 tax liability is time barred. OPINION Petitioners admit that respondent issued his notice of deficiency for 1976 prior to December 31, 1981, the extended assessment date as set forth in Form 872. Based on such admission, we find that respondent's notice of deficiency was timely issued. Issue 8. Additions to Tax
FINDINGS OF FACT Respondent determined additions to tax under sections 6653(b), 6653(a), 6651(a)(1) and 6654. For convenience, we will combine the discussion of the application of the section 6653(b) fraud addition, the section 6653(a) negligence or intentional disregard of rules *86 and regulations addition, the section 6651(a)(1) failure to file addition, and the section 6654 failure to pay estimated tax addition. OPINION Section 6653(b) provides for an addition to tax equal to 50 percent of any underpayment of tax if any part of the underpayment is due to fraud. The burden of proof is upon respondent to prove such fraud by clear and convincing evidence. Rule 142(b); section 7454(a). Respondent must establish that: (1) there has been an underpayment of tax; and (2) the underpayment was due to fraud by the taxpayer. Hebrank v. Commissioner,81 T.C. 640 (1982). The fraud to be shown is an intentional, actual wrongdoing; the intent is the specific purpose to evade a tax known to be owing. Stoltzfus v. United States,398 F.2d 1002 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Mitchell v. Commissioner,118 F.2d 308 (5th Cir. 1941). The existence of fraud requires the consideration and evaluation of the entire record in a case. Rowlee v. Commissioner,80 T.C. 1111 (1983); *87 Gajewski v. Commissioner,67 T.C. 181 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Where direct evidence of fraud is not available, circumstantial evidence may be used. A taxpayer's entire course of conduct may be examined to infer the necessary fraudulent intent. Stephenson v. Commissioner,79 T.C. 995 (1982), affd. per curiam 748 F.2d 331 (6th Cir. 1984). Such an inference may not be made, however, from a mere understatment of income, nor from a deficiency due to honest mistake or poor judgment. Iley v. Commissioner,19 T.C. 631 (1952). As an alternative to the imposition of the addition to tax for fraud, respondent asserts with respect to McDade and Pine Lake the application of: (1) the section 6653(a) addition to tax for negligence or intentional disregard of rules or regulations and (2) the section 6651(a)(1) addition to tax for failure to file returns or to pay tax. Section 6653(a) provides for an addition to tax of 5 percent of the underpayment if any part of such underpayment is due to negligence or the intentional disregard of rules or regulations, but without intent *88 to defraud. Under this section, negligence is "a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Neely v. Commissioner,85 T.C. 934, 947 (1985); Marcello v. Commissioner,380 F.2d 499, 506 (5th Cir. 1967). The taxpayer normally bears the burden of proof with respect to this issue. Bixby v. Commissioner,58 T.C. 757 (1972); Rule 142(a). Respondent, however, raised this argument in his answers to the petitions filed with respect to McDade for 1972, 1973, and 1974, and Pine Lake for its 1974 and 1975 fiscal years. As such, respondent bears the burden of proof on this issue. Rule 142(a). Section 6651(a)(1) allows an addition to tax for the failure to file any return in the amount of 5 percent of the determined tax, not to exceed 25 percent. As with the negligence addition, respondent raised the section 6651 argument in his answers to McDade's and Pine Lake's petitions and therefore bears the burden of proof with respect to this issue. Finally, respondent determined McDade is liable for additions to tax under *89 section 6654(a). That section provides for an addition to tax for the underpayment of estimated taxes. Such underpayment of estimated taxes results in a mandatory addition to tax unless petitioner comes within one of the limited exceptions provided by section 6654(d). Extenuating circumstances are not a basis for relief from this section's application. Grosshandler v. Commissioner,75 T.C. 1, 20 (1980). Petitioner bears the burden of proving respondent's error in the imposition of this addition to tax. Habersham-Bey v. Commissioner,78 T.C. 304, 319 (1982). (a) McDade - 1972, 1973, 1974 After consideration of the entire record, we find that respondent carried his burden of proving, by clear and convincing evidence, that McDade's underpayment of tax in 1972 and 1973 was due to fraud. However, he did not carry this burden with respect to 1974. In support of his contention that McDade's underpayment was due to fraud, respondent points to: McDade's failure to file returns (in itself not conclusive - *90 Kotmair v. Commissioner,86 T.C. 1253 (1986); substantial understatements of income regarding the bribery income and Bill's taxable receipts in 1972 and 1973; lack of adequate books and records describing the bribery income and Bill's receipts; lack of sufficient explanation regarding omitted income items, etc.; and McDade's prior criminal tax prosecutions in 1969, 1970 and 1971. We find most persuasive respondent's arguments regarding McDade's failure to report his bribery income for these years. An affirmative willful attempt to evade taxes may be inferred from the concealment and understatement of sources of income. Spies v. United States,317 U.S. 492, 499 (1943); McGee v. Commissioner,61 T.C. 249, 261, affd. 519 F.2d 1121 (5th Cir. 1975).McDade admits that he failed to report bribery income in the years 1972 and 1973. We find that McDade's concealment of his bribery income constitutes fraud within the meaning of section 6653(b). As such, respondent has carried his burden of proving fraud with respect to the years 1972 and 1973. However, as to 1974, we find that respondent did not carry his burden of proof. *91 Respndent's arguments and evidence for this period consisted mainly of McDade's failure to file returns and to keep adequate records of transactions over the years. A mere failure to file a return is not, in and of itself, sufficient to sustain a finding of fraud. Kotmair v. Commissioner,supra.A failure to keep complete or adequate records is considered a "badge of fraud," but not a conclusive indication thereof. Spies v. United States,supra at 499. Taken together, and in the absence of any other significant proof by respondent in this regard, we find that respondent failed to prove fraud for 1974. Respondent has, however, carried his burden of proof with respect to his alternative determination for 1974 of the addition to tax under section 6653(a) for negligence or intentional disregard of rules or regulations. We find that McDade failed to exercise due care and ordinary prudence with respect to his 1974 tax obligations, and therefore we sustain respondent's alternative determination of the negligence addition under section 6653(a) for 1974. McDade filed no returns in the years 1972, 1973 and 1974. Section 6651(a)(1) mandates additions *92 to tax, outlined supra, for a failure to file tax returns if such failure is due to willful neglect and not to reasonable cause. We are not persuaded by McDade's argument that he failed to file returns because his records were not available to enable him to file his returns, nor his assertion that he was advised not to file such returns by his lawyer. We find, therefore, that respondent sustained his burden of proof with respect to the addition under section 6651(a)(1) for taxable year 1974. Respondent has also determined the addition to tax under section 6654(a) for the failure to pay estimated income tax. The burden of proving error in respondent's determination was on McDade, who failed to produce any evidence to indicate that he falls within any of the computational exceptions to imposition provided by section 6654(d). We find, therefore, that McDade is liable for additions to tax under section 6654 for taxable years 1972, 1973 and 1974. (b) McDade and Clare - 1976 Respondent determined the addition to tax for fraud under section 6653(b) for McDade and Clare for the year 1976, the only year at issue for which a return was filed. Respondent bears the burden of proof *93 in this regard. Rule 142(b); section 7454(a). Respondent's determination of fraud is premised upon McDade's and Clare's failure to report an alleged substantial capital gain incurred in 1976 from the sale of stock in Jodi Lynn.As we have found, the McDades sustained a capital loss (rather than a capital gain) from the sale of the Jodi Lynn stock. Hence, since respondent's premise is erroneous, this issue is moot. (c) Pine Lake - 1974 and 1975 Respondent determined additions to tax under section 6653(b) for Pine Lake's 1974 and 1975 fiscal years. The burden of proof is on respondent with regard to this addition. Rule 142(b). Respondent asserts that Pine Lake was dominated by McDade during the years in issue, and that Pine Lake was McDade's alter ego. As such, he argues, any fraudulent activities on the part of McDade should be imputed to the corporation for purposes of the fraud addition. A corporation can act only through its officers, and corporate fraud necessarily depends upon the activities and intent of the corporate officers. See *94 Hicks Co. v. Commissioner,470 F.2d 87 (1st Cir. 1972), affg. 56 T.C. 982 (1971). Such fraudulent activities or intent may be attributed to the corporation in the event the corporation is the alter ego of the officer or shareholder, or the officer or shareholder was acting on behalf of, and not against, the interests of the corporation. Asphalt Industries, Inc. v. Commissioner,384 F.2d 229, 233-234 (3d Cir. 1967). We find that neither McDade nor Pine Lake engaged in such activities, and that neither had the intent required to sustain a finding of fraud for either fiscal year 1974 or 1975. Respondent cites a number of instances which he believes constituted fraudulent activities by McDade and Pine Lake, which can be summarized as a failure to file returns and a failure to keep adequate records. The corporation admittedly did not file returns in the years in question. It is also apparent that the records of the corporation were inadequate. Such failures may be indices of fraud under some circumstances; however, we find that the failure to file returns and to keep adequate records was not due to fraud in this case. [12]
*95 We find, however, that Pine Lake is liable for the additions to tax under sections 6653(a) and 6651(a)(1) for 1974 and 1975. Respondent bore the burden of proof with respect to such additions, having raised the additions in his answer. Pine Lake's failure to file returns and failure to keep adequate records evidence a lack of reasonable care with regard to its tax bligations. Even though the financial records of the corporation were incomplete, such records should have put the corporation and its officers (i.e., McDade) on notice of the necessity to file corporate tax returns. Reasonable diligence would have led to this conclusion. In the absence of any credible evidence to the contrary, and based upon the record in this case, we find that respondent carried his burden of proof; the additions to tax under section 6653(a) for Pine Lake's 1974 and 1975 fiscal years will be imposed. Pine Lake admits that it failed to file tax returns for the years in issue and had no reasonable cause for such failure to file. Pine Lake is therefore liable for additions to tax for its failure to file tax returns for fiscal years 1974 and 1975 as provided in section 6651(a)(1). To reflect the *96 foregoing, Decisions will be entered under Rule 155.
Footnotes
1. The following cases have been consolidated herewith: Jodi Lynn Enterprises, Inc., docket No. 6542-82; Pine Lake Inn, Inc., docket No. 6543-82; and William J. McDade, Jr. & Clare T. McDade, docket No. 6544-82.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
3. In addition, McDade was criminally prosecuted for, and pleaded guilty to, failure to file Federal income tax returns for 1969, 1970, and 1971.↩
4. Respondent had previously audited the years 1969, 1970, and 1971 for Bill's, with the results having been agreed to by McDade. McDade also admitted that he "was very poor in the way of bookkeeping".↩
5. McDade actually benefited by respondent's determination under this method, as respondent determined that petitioner was entitled to a business expense deduction of $24,474.99 in lieu of $4,700.00 as reflected in petitioner's records.↩
6. The parties stipulated that the Ashborne property was sold for $9,000 and that McDade's cost basis for the property was $2,500. Respondent determined that McDade realized a long-term capital gain of $6,500 upon the sale of the property which he failed to report. No evidence was presented which would enable us to determine McDade's adjusted basis in the property. We therefore accept respondent's determination as to the amount of gain.↩
7. Had McDade presented at least some evidence with regard to the amounts claimed, we might have been disposed to find that there was "sufficient evidence to satisfy the trier that at least the amount allowed in the estimate was in fact spent or incurred for the stated purpose." Williams v. United States,245 F.2d 559, 560 (5th Cir. 1957). Such a finding would have given us discretion to use the rule of Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). However, with no more than petitioner's mere testimony and allegations as to the taxes and expenses, it would be inappropriate to invoke the Cohan↩ rule.
8. Because of his criminal conviction, McDade could not hold the liquor license needed to operate the tavern. To resolve the problem, Jodi Lynn was formed, and McDade was not a record stockholder of Jodi Lynn.↩
9. We are concerned here with constructive intent to effect a fraudulent conveyance, as provided by the statute, rather than with actual intent.↩
10. Although Claire and Patricia were the record owners of the stock, McDade concedes that Patricia held stock in Jodi Lynn on his behalf and that any gain from the sale of the stock is taxable to him and Claire.↩
11. The debts to the Nativity Club and to Pine Lake were not the McDades' debts; hence, they are not included in determining the "amount realized."↩
12. We recognize that several items of income were omitted by the failure of the corporation to file returns. However, these omissions were not so substantial, in light of the absence on the record of significant other indices of an overall fraudulent intent, to support a finding of such intent.↩